IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| AMERICAN NATIONAL | § | |
| INSURANCE CO., AMERICAN | § | |
| NATIONAL LIFE INSURANCE | § | |
| COMPANY OF TEXAS, | § | |
| COMPREHENSIVE INVESTMENT | § | |
| SERVICES, INC., THE MOODY | § | |
| FOUNDATION | § | |
|     Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| RICHARD S. FULD, JR., | § | |
| CHRISTOPHER M. O'MEARA, | § | |
| JOSEPH GREGORY, ERIN | § | |
| CALLAN, IAN LOWITT, MICHAEL | § | |
| L. AINSLIE, JOHN F. AKERS, | § | |
| ROGER S. BERLIND, THOMAS H. | § | |
| CRUIKSHANK, MARSHA | § | |
| JOHNSON  EVANS, SIR | § | |
| CHRISTOPHER GENT, ROLAND A. | § | |
| HERNANDEZ, HENRY KAUFMAN, | § | |
| JOHN D. MACOMBER, BANC OF | § | |
| AMERICA SECURITIES LLC, | § | |
| CITIGROUP GLOBAL MARKETS | § | |
| INC., MERRILL LYNCH & CO. | § | |
| FOUNDATION INC. F/K/A | § | |
| MERRILL LYNCH, PIERCE, | § | |
| FENNER & SMITH INC., MORGAN | § | |
| STANELY & CO. INC., UBS | § | |
| SECURITIES LLC, WELLS FARGO | § | |
| SECURITIES LLC, WACHOVIA | § | |
| CAPITAL MARKETS LLC, BNY | § | |
| MELLON CAPITAL MARKETS | § | |
| LLC F/K/A MELLON FINANCIAL | § | |
| MARKETS LLC, WILLIAMS | § | |
| CAPITAL GOUP LP, CALYON | § | |
| SECURITIES INC., UNICREDIT | § | |
| CAPITAL MARKETS INC. F/K/A | § | |
| HVB CAPITAL MARKETS INC., | § | |
| DAIWA SECURITIES, U.S. | § | |
| BANKCORP PIPER JAFFRAY INC., | § | |
| RIDGE CLEARING & | § | |
| OUTSOURCING SOLUTIONS INC. | § | |

**F/K/A FLEET SECURITIES INC.,** §
**RBC DAIN RAUSCHER INC., BBVA** §
**SECURITIES INC., BNY CAPITAL** §
**MARKETS INC., CITI, RBS** §
**GREENWICH CAPITAL,** §
**SUNTRUST ROBINSON** §
**HUMPHREY INC. F/K/A SUNTRUST** §
**CAPITAL MARKETS, ERNST &** §
**YOUNG LLP** §
 §
       **Defendants** § **JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I.      Nature of the Case.................................................................................................3

II.     Relevant Non-Parties .........................................................................................5

III.    Parties          .........................................................................................................6

IV.     Jurisdiction and Venue.......................................................................................13

V.      Facts            .........................................................................................................14

        A.      The Mortgage Market ...........................................................................15

                1.      The Rise and Fall of the United States Real Estate Market . . . . . . . . . . . .15

                2.      Classification of Mortgage Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                        a..........Prime Mortgage Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

                        b..........Subprime Mortgage Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

                        c..........Alt- A Mortgage Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

        B.      Lehman's Involvement in the Mortgage Market . . . . . . . . . . . . . . . . . . . .19

                1.      Lehman as Leader in CDO Market ............................................20

                2.      Aurora Loan Services:  Lehman's Alt-A Mortgage Lender ....................20

                3.      BNC Mortgage:  Lehman's Subprime Mortgage Lender ........................21

                4.      Requests for Loan Repurchases ...............................................22

                5.      Lehman's Competitors Face Difficulties in the Real Estate Market ........23

                6.      Lehman's Hidden Exposure to a Failing Real Estate Market....................25

                        a.......... Rising Foreclosure Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

                        b.......... Lehman's Failure to Report Subprime and Alt-A Exposure . . . . .25

                        c..........Lehman's Lack of Risk Controls . . . . . . . .. . . . . . . . . . . . . . . . . .27

                        d..........Lehman's Improper Valuation of Assets . . . . . . . . . . . . . . . . . . . 32

                                i. .........Observable Inputs for Fair Value Accounting . . . . . . . . .35

i

        ii. ........Lehman's Increased Level 3 Assets . . . . . . . . . . . . . . . . . 35

        e..........Lehman's Failure to Take Appropriate Write-downs . . . . . . . . . 38

        f. .........Lehman's Overvaluation of its Assets . . . . . . . . . . . . . . . . . . . . 41

        g..........Lehman's Failure to Disclose its Lack of Capital and Liquidity . 42

C.     Lehman's Various Underwriters................................................................44

D.     E&Y:  Lehman's Auditor........................................................................45

      1.     E&Y's Role in Lehman's financial statements . . . . . . . . . . . . . . . . . . .46

      2.     E&Y's knowledge of Lehman's misrepresentations . . . . . . . . . . . . . .47

      3.     E&Y's Auditing Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

        a..........Generally Accepted Auditing Standards . . . . . . . . . . . . . . . . . . .50

        b.......... Statements on Auditing Standards ("SAS") . . . . . . . . . . . . . . 52

E.     Specific Misrepresentations in SEC Filings ........................................55

      1.     2006 SEC Filings ........................................................................55

      2.     Lehman's 2007 First Quarter 10Q ..............................................57

      3.     Lehman's 2007 Second Quarter 10Q...........................................57

      4.     Lehman's 2007 Third Quarter 10Q..............................................62

      5.     Lehman's 2007 10K ....................................................................65

      6.     Lehman's 2008 First Quarter 10-Q..............................................69

F.     Securities Purchased by Plaintiffs........................................................71

      1.     The ANICO Bond .......................................................................73

      2.     The ANTEX Bond .......................................................................73

      3.     Preferred J stocks .......................................................................73

      4.     The Moody Foundation Bonds ....................................................73

        a.  CUSIP 52519FFE6 7 ........................................................73

          b.  CUSIP 52519FFD8 ...............................................................74

          c.  CUSIP 52519FFB2 ...............................................................74

          d.  CUSIP 52517P6B2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

          e.  CUSIP 52517PS69 ...............................................................74

          f.  CUSIP 524908R44 ...............................................................74

      5.       Misrepresentations in Registration Statements and Prospectuses for Securities Purchased by Plaintiffs ............................................................75

VI.     Officer Defendant's Scienter ...................................................................76

    A.     Defendant Fuld ........................................................................78

    B.     Defendant O'Meara ................................................................79

    C.     Defendant Gregory..................................................................81

    D.     Defendant Callan .....................................................................81

    E.     Defendant Lowitt .....................................................................82

VII.    Loss Causation ...........................................................................................82

VIII.  Causes of Action ........................................................................................83

    A.     Violation of Section 10(b) of The Exchange Act .................................83

    B.     Violation of Section 20(A) of The Exchange Act ................................86

    C.     Violations of Section 11 of The Securities Act ...................................86

        1.      CIS's Claims .................................................................87

        2.      ANICO's Claims............................................................88

        3.      ANTEX's Claims...........................................................89

        4.      Moody Foundation's Claims...........................................90

    D.     Violations of Section 12(A)(2) of The Securities Act ...........................91

    E.     Violations of Section 15 of The Securities Act ...................................93

F.      Violation of § 27.01 of The Texas Business And Commerce Code ..................... 94

G.     Aiding And Abetting Violation of § 27.01 of The Texas Business and Commerce Code   .............................................................................................. 95

H.     Violations of Texas Securities Act ....................................................... 96

I.      Aiding & Abetting of The Texas Securities Act ...................................... 97

       1.     CIS's Claims ....................................................................... 97

       2.     Moody Foundation's Claims ................................................ 100

J.      Violations of the Texas Securities Act – Control Person Liability ..................... 102

K.     Common Law Fraud ........................................................................ 102

L.     Negligent Misrepresentation .............................................................. 103

IX.   Prayer       .................................................................................. 104

iv

## COMPLAINT

Plaintiffs American National Insurance Company, American National Life Insurance Company of Texas, Comprehensive Investment Services, Inc. and The Moody Foundation file this Complaint alleging as follows:

## I.        NATURE OF THE CASE

1. Beginning in 2004, the housing bubble that many analysts warned would one day pop began showing unmistakable signs that it was, at least, rapidly deflating.  As interest rates rose and home values fell, many home owners who were already stretching to make mortgage payments found themselves suddenly unable to meet their obligations and began defaulting on their loans.  Lenders who held those loans and investors who bought mortgage backed securities containing those loans began to feel the crunch as defaults grew at an impressive rate.  Entities with exposure to mortgage backed securities ultimately saw declines in their liquidity, capital and cash flow.  Eventually, shut their doors.

2. Lehman Brothers Holdings Inc. ("Lehman") was heavily leveraged in the mortgage backed securities market, including subprime and Alt-A loans.  However, even in the face of a crashing real estate market, Lehman actively concealed the increasingly dangerous risk it faced and failed or refused to properly value its assets.  In fact, despite knowing of the dangers associated with its mortgage backed securities, Lehman and each Defendant repeatedly asserted to investors that Lehman's financial condition was sound due to its strong capital base and superior risk management practices.

3. Even as Lehman's competitors collapsed or publicized obvious difficulties resulting from the real estate market's downturn, Lehman assured its investors that it was stable, in a superior position to its competitors and confident that it had the ability to overcome the obstacles

3

of the market.  However, as Lehman made these reassurances publicly, internally it knew or should have known it was subjecting its investors to hidden risks.

4. For example, Lehman was one of the top lenders of Alt-A mortgage loans.[1]  However, in public filings Lehman and Defendants failed to delineate the amount of Alt-A (or subprime) loans Lehman carried on its books or its risk exposure for Alt-A loans even when such loans became problematic due to an increasing default rate.  Lehman and Defendants actively misled the investing public by (i) failing to disclose information about non-prime loans and/or (2) deceptively lumping prime, subprime, and Alt-A loan figures together, without explanation, in SEC filings, which were incorporated into various registration statements.  Critically, Lehman's reporting contained no meaningful information at all about its subprime or Alt-A portfolios. Lehman's failure to disclose its true exposure to risky loans led investors to believe, falsely, that Lehman's financial condition was strong.

5. In late 2007, Lehman reported that its liquidity position was stronger than ever and Defendant Richard Fuld assured investors that Lehman's "global franchise and brand have never been stronger," a sentiment repeated by Defendant Ian Lowitt in March of 2008.  However, despite the rosy public pronouncements, Lehman and Defendants were misleading the investing public about the nature and extent of Lehman's exposure to its mortgage back securities portfolio. Defendant Lowitt even stated in Lehman's third quarter earnings conference call on September 10, 2008, that Lehman did not believe it needed to raise additional capital. Five days later Lehman filed for Chapter 11 bankruptcy resulting in the largest bankruptcy in the history of the United States.

---

[1] Alt-A loans are issued to individuals who cannot qualify for a prime loan and are, therefore, a riskier investment. See discussion at V(A)(2)(c) below.

6. Based on misrepresentations made by Lehman and the Defendants, which were contained in SEC filings, prospectuses, registration statements and statements to the investing public, Plaintiffs purchased Lehman securities.

7. This suit arises out of Defendants' wrongful acts and omissions with respect to Lehman's mortgage portfolio. Plaintiffs seek equitable and/or monetary relief pursuant to Section 10(b) of Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder,[2] Section 20(a) of the Exchange Act,[3] Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"),[4] the Texas Statutory Fraud provision,[5] the Texas Securities Act,[6] and Texas common law claims for aiding and abetting fraud, fraud and negligence.

## II.    RELEVANT NON-PARTIES

8. Lehman Brothers Holdings Inc. ("Lehman") was incorporated in Delaware and maintained its principal place of business in New York, New York.  Lehman operated as a global investment bank and described itself as "an innovator in global finance" with a "leadership position in equity and fixed income sales, trading and research."   On September 15, 2008, Lehman filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.

9. Lehman Brothers Inc. ("LBI") was incorporated in Delaware and maintained its principal place of business in New York, New York.  LBI is a wholly-owned subsidiary of Lehman.  LBI is registered with the SEC as a broker-dealer pursuant to the Exchange Act.  LBI's services included brokerage services, mergers and acquisitions and restructuring advice, debt and equity underwriting, market making, debt and equity research, and real estate and private equity

---

[2] 15 U.S.C. § 78j(b) and 17 C.F.R. §240.10b-5, respectively
[3] 15 U.S.C. § 78t
[4] 15 U.S.C. §§77k, 77l(a)(2) and 77o.
[5] Tex. Bus. & Comm Code. § 27.01
[6] Tex. Rev. Civ. Stat. Ann. Art. 581-1 et seq.,

investments.  On September 17, 2008, the Securities Investor Protection Corporation ("SIPC") moved for an order commencing liquidation and protection under the automatic stay provisions of the United States Bankruptcy Code.  On September 19, 2008, the United States Bankruptcy Court for the Southern District of New York granted SIPC's request to commence liquidation.

10.  Lehman and LBI are expressly not named as defendants in this action.

### III.    PARTIES

11.  American National Insurance Company ("ANICO") is a Texas insurance company with its principal place of business in Galveston, Texas.

12.  American National Life Insurance Company of Texas ("ANTEX") is a Texas insurance company with its principal place of business in Galveston, Texas.

13.  Comprehensive Investment Services Inc. ("CIS") is a Nevada corporation with its principal place of business in League City, Texas.

14.  The Moody Foundation ("Moody Foundation") is a charitable trust operating as a private foundation with its principal place of business in Galveston, Texas.

15.  Defendant Richard S. Fuld, Jr. ("Fuld") joined Lehman in 1969, became Chief Executive Officer ("CEO") in November 1993 and was named Chairman of the Board of Directors in April 1994.   At all relevant times, Fuld was chair of Lehman's Executive Committee, which had the authority, in the intervals between meetings of the Board of Directors, to exercise all the authority of the Board of Directors, except for those matters solely reserved to the full Board of Directors by Delaware law or Lehman's Restated Articles of Incorporation. Defendant Fuld was also chairman and CEO of LBI.

16.  Defendant Christopher M. O'Meara ("O'Meara") served as Lehman's Chief Financial Officer ("CFO"), Controller, and Executive Vice President from 2004 until December 1, 2007.

6

O'Meara joined Lehman in 1994 and prior to serving as CFO he operated as Lehman's Global Controller.  As Controller, O'Meara supervised Lehman's internal accounting programs and procedures.  Beginning on December 1, 2007, O'Meara served as the head of Worldwide Risk Management.  In his role as the head of Risk Management, O'Meara was also responsible for supervising Lehman's risk mitigation strategies and procedures.

17. Defendant Joseph M. Gregory ("Gregory") was, at all relevant times, Lehman's President and Chief Operating Officer ("COO"), until forced to resign in June 2008.  Defendant Gregory, in his role as COO, oversaw the day-to-day management of Lehman's operations.  He previously served as head of Lehman's Equities and Fixed Income Divisions, including Lehman's mortgage business, and head of Lehman's Global Equities Division, including the overall equities business.

18. Defendant Erin Callan ("Callan") became Lehman's CFO and Executive Vice President on December 1, 2007, and served in that position until she resigned in June 2008.  Callan joined Lehman in 1995 and served in various capacities, including head of the Investment Banking Global Hedge Fund Coverage Group, the Global Finance Solutions Group, and Global Finance Analytics Group.

19. Defendant Ian Lowitt ("Lowitt") joined Lehman in 1994.  He replaced Callan as CFO in June 2008 and also served as the Co-Chief Administrative Officer.  Lowitt oversaw Lehman's finance organization, including Financial Controls, Investor Relations, Planning and Analysis, Product Control, Tax and Treasury.  In his role as Co-Chief Administrative Officer, he was responsible for the global oversight of Risk Management.   Lowitt was also a member of Lehman's Executive Committee.  Lowitt was Chief Administrative Officer for Lehman Europe from July 2005 until October 2006.

20.  Defendant Michael L. Ainslie ("Ainslie") was at all relevant times a director of Lehman and signed registration statements filed with the SEC in his capacity as a director of Lehman.

21.  Defendant John F. Akers ("Akers") was at all relevant times a director of Lehman and signed registration statements in his capacity as a director of Lehman.  Akers was also a member of Lehman's Finance & Risk Committee.

22.  Defendant Roger S. Berlind ("Berlind") was at all relevant times a director of Lehman and signed registration statements in his capacity as a director of Lehman.  Defendant Berlind was also a director of LBI and a member of Lehman's Audit and Finance & Risk Committees.

23.  Defendant Thomas H. Cruikshank ("Cruikshank") was at all relevant times a director of Lehman and signed registration statements in his capacity as a director of Lehman.  Defendant Cruikshank was also a director of LBI.

24.  Defendant Marsha Johnson Evans ("Evans") was at all relevant times a director of Lehman and signed registration statements in her capacity as a director of Lehman.

25.  Defendant Sir Christopher Gent ("Gent") was at all relevant times a director of Lehman and signed registration statements in his capacity as a director of Lehman.  Defendant Gent was also a director of LBI.

26.  Defendant Roland A. Hernandez ("Hernandez") was at all relevant times a director of Lehman and signed registration statements in his capacity as a director of Lehman.  Hernandez was also a member of the Finance & Risk Committee.

27.  Defendant Henry Kaufman ("Kaufman") was at all relevant times a director of Lehman and signed registration statements in his capacity as a director of Lehman.  Kaufman was also Chairman of Lehman's Finance & Risk Committee.

8

28. Defendant John D. Macomber ("Macomber") was at all relevant times a director of Lehman and signed registration statements in his capacity as a director of Lehman.

29. Defendant Banc of America Securities LLC ("BOA"), incorporated in Delaware, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. BOA underwrote and sold depositary shares of Lehman Preferred Series J Shares.

30. Defendant Citigroup Global Markets Inc. ("CGMI"), incorporated in New York, is a subsidiary of Citigroup Inc., a financial services institution that, through it subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. CGMI underwrote and sold depositary shares of Lehman Preferred Series J Shares.

31. Defendant Merrill Lynch & Co. Foundation Inc. f/k/a Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), incorporated in Delaware, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. Merrill Lynch underwrote and sold depositary shares of Lehman Preferred Series J Shares.

32. Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley"), incorporated in Delaware, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. Morgan Stanley underwrote and sold depositary shares of Lehman Preferred Series J Shares.

33. Defendant SunTrust Robinson Humphrey Inc. ("SunTrust"), incorporated in Tennessee, is a financial services institution that, through it subsidiaries and divisions, provides commercial

and investment banking services and commercial loans to corporate entities.  SunTrust underwrote and sold depositary shares of Lehman Preferred Series J Shares.

34. Defendant UBS Securities LLC ("UBS"), incorporated in Delaware, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. UBS underwrote and sold depositary shares of Preferred Lehman Series J Shares.

35.  Defendant Wells Fargo Securities LLC ("Wells Fargo"), incorporated in Delaware, is a financial services institution that, though its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  Wells Fargo underwrote and sold depositary shares of Lehman Series J Shares.

36.  Defendant RBC Dain Rauscher Inc. ("RBC"), incorporated in Minnesota, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. RBC underwrote and sold depositary shares of Lehman Preferred Series J Shares.

37.  Defendant Wachovia Capital Markets LLC ("Wachovia"), incorporated in Delaware, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  Wachovia underwrote and sold depositary shares of Lehman Preferred Series J Shares.

38.  Defendant U.S. Bankcorp Piper Jaffray Inc. ("Piper"), incorporated in Delaware, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  Bankcorp underwrote and sold Medium-Term Notes, Series G.

39. Defendant Ridge Clearing & Outsourcing Solutions, Inc. f/k/a Fleet Securities Inc. ("Fleet"), incorporated in Delaware, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.   Fleet underwrote and sold Medium-Term Notes, Series G.

40. Defendant BNY Mellon Capital Markets LLC f/k/a Mellon Financial Markets LLC, ("Mellon") incorporated in Delaware, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  Mellon underwrote and sold Medium-Term Notes, Series H.

41. Defendant Williams Capital Group LP ("Williams Capital"), a limited partnership, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.     Williams Capital underwrote and sold Medium-Term Notes, Series H.

42. Defendant Calyon Securities Inc. ("Calyon"), incorporated in  New York, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities. Calyon underwrote and sold Medium-Term Notes, Series H.

43. Defendant Unicredit Capital Markets Inc. f/k/a HVB Capital Markets Inc. ("HVB"), incorporated in New York, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  HVB underwrote and sold Medium-Term Notes, Series H.

44.  Defendant Daiwa Securities ("Daiwa") incorporated in New York, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.   Daiwa underwrote and sold Medium-Term Notes, Series H.

45.  Defendant BBVA Securities, ("BBVA") incorporated in Delaware, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  BBVA underwrote and sold Medium-Term Notes, Series I.

46.  Defendant BNY Capital Markets Inc., ("BNY") incorporated in New York, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  BNY underwrote and sold Medium-Term Notes, Series I.

47.  Defendant Suntrust Robinson Humphrey Inc. f/k/a SunTrust Capital Markets Inc ("SunTrust Capital") incorporated in Georgia, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.   SunTrust Capital underwrote and sold Medium-Term Notes, Series I.

48.  Defendant Citi incorporated in Delaware, is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  Citi underwrote and sold Medium-Term Notes, Series I.

49.  Defendant RBC Capital Markets Corporation ("RBC Capital Markets") incorporated in Minnesota, is a financial services institution that, through its subsidiaries and divisions, provides

commercial and investment banking services and commercial loans to corporate entities.  RBC Capital Markets underwrote and sold Medium-Term Notes, Series I.

50. Defendant RBS Greenwich Capital is the marketing name for the securities business Greenwich Capital Markets Inc., incorporated in Delaware.  RBS Greenwich Capital is a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  RBS Greenwich Capital underwrote and sold Medium-Term Notes, Series I.

51. Defendant Ernst & Young LLP ("E&Y") a limited liability partnership, is a public accounting firm.  E&Y served as Lehman's auditor at all times relevant to this complaint and the claims alleged.  E&Y audited Lehman's financial statements, provided written reports regarding the internal controls of Lehman and reviewed Lehman's quarterly financial results.

52. The Defendants described in ¶¶15-19 are referred to collectively as the "Officer Defendants."  The Defendants described in ¶¶20-28 are referred to collectively as the "Director Defendants." The Defendants described in ¶¶29-37 are referred to collectively as "Preferred J Underwriter Defendants."  The Defendants described in ¶¶38-39 are referred to collectively as "ANICO Bond Underwriter Defendants."  The Defendants described in ¶¶40-44 are referred to collectively as "ANTEX Bond Underwriter Defendants."  The Defendants described in ¶¶45-50 are referred to as "Moody Foundation Underwriter Defendants."

## IV.    JURISDICTION AND VENUE

53. This action arises under the laws of the United States including Sections 10(b) and 20 of the Exchange Act, and Sections 11, 12(a) (2) and 15 of the Securities Act and involves federal questions.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332, Section 27 of the Exchange Act, 15 U.S.C. § 78aa and Section 22 of the

Securities Act, 15 U.S.C. §77v.   Moreover, this Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367.

54.  Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; Section 22 of the Securities Act 15 U.S.C. § 77v (a); and 28 U.S.C. § 1391(b).

55.  The Court has personal jurisdiction over all Defendants in connection with the acts alleged in this complaint.   Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.  All Defendants are residents of the United States and have availed themselves of federal securities laws.  The Court has jurisdiction over the parties and subject matter of this cause, and has jurisdiction to grant all relief requested by Plaintiffs.

## V.    FACTS

56.  In a 2008 internal presentation Lehman asked itself the question that investors would soon be asking it:

**WHY DID WE ALLOW OURSELVES TO BE SO EXPOSED?**

Lehman's internal answer was clear:

- o **CONDITIONS CLEARLY NOT SUSTAINABLE**
- o **SAW WARNING SIGNS**
- o **DID NOT MOVE EARLY/FAST ENOUGH**
  - ▪ **ILLIQUID ASSET ORIG'N TOO MUCH/TOO LONG**
  - ▪ **BEHAVED TOO MUCH INVESTORS, NOT TRADERS**
- o **NOT ENOUGH DISCIPLINE ABOUT CAPITAL ALLOCATION**

Taken from a July/August 2008 internal Lehman document produced to the House of Representatives Committee on Oversight and Government Reform.

14

57.  Indeed, Lehman "saw warning signs" as early as November of 2004 when Defendant Richard Fuld, CEO of Lehman, stated that low interest rates and cheap credit would create a real estate bubble that would one day pop.  "It's like paving the road with cheap tar," he said.  "When the weather changes, the potholes that were there will be deeper and uglier."[7]  However, despite the "warning signs" Lehman invested heavily in a doomed mortgage backed securities market and actively hid that fact from the investing public.

**A.      The Mortgage Market**

**1.      The Rise and Fall of the United States Real Estate Market**

58.  In the 1990s and early 2000s the United States real estate market boomed due to rising home values and low interest rates on mortgages. As a result, more Americans sought financing for homeownership and lenders began to compete for potential borrowers by lowering credit standards and offering alternative mortgage products to less qualified individuals.

59.  Alternative loan products included:

1.      No-documentation and low-documentation loans:  Known in the industry as "liar loans," the practice of requiring little or no documentation from borrowers constituted as much as 40 percent of subprime mortgages issued in 2006, up from 25 percent in 2001.  *See* Gretchen Morgenson, *Crisis Looms in Mortgages*, N.Y. Times, Mar. 11, 2007 *available at*

http://www.nytimes.com/2007/03/11/business/11mortgage.html.

2.      Piggy-back loans:  These combine a mortgage with a home-equity loan or line of credit, allowing borrowers to finance more than 80 percent of the home's value without paying for private mortgage insurance.  As of 2006, about half of all subprime loans included "piggyback" loans, and on average all borrowers

---

[7] November 2004 *Bloomberg* report.

financed 82 percent of the underlying value of their property, markedly up from 48 percent in 2000.  *See Id*.; James R. Hagerty & Ruth Simon, *Home Lenders Pare Risky Loans – More Defaults Prompt Cut in 'Piggyback' Mortgages; Housing Markets May Suffer*, Wall St. J., Feb. 14, 2007, at A3.

3.  Interest-only mortgages:  These allow borrowers to pay interest and no principal in the loan's early years, which keep payments low for a time, but require that the deferred payment of principal be made in the future through increased monthly or balloon payments.  *Id*.

4.  Option adjustable-mortgages:  These loans, called hybrid ARMs, were marketed with promotional or "teaser" rates during an introductory period that later ballooned to much higher rates once the introductory period has ended.  ARMs currently account for between one-half and one-third of subprime mortgages.  *See* Testimony of Roger T. Cole, Director, Division of Banking Supervision and Regulation, The Federal Reserve Board, *Mortgage Markets*, Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate, Mar. 22, 2007, *available at*

http://www.federalreserve.gov/boarddocs/testimony/2007/2007032/default.htm

60. In addition to the increased interest in homeownership, many financial firms began "securitizing" mortgages by buying them from the original lender, pooling them with other mortgages, and selling interests in the underlying cash flow to investors.  This practice freed up capital for the original lender so that it could approve more and more loans.

61.  However, beginning as early as 2004, the real estate and mortgage markets experienced a tremendous downturn, initiated and fueled by falling home values, rising interest rates and the

16

proliferation of the high-risk mortgage loans.  As a result, the market experienced a surge in mortgage loan defaults, causing increased exposure to losses to financial institutions, like Lehman, that were heavily invested in mortgage-backed securities.

### 2.     Classification of Mortgage Loans

62. There are various types of mortgage loan products.  Mortgage loans differ based on factors such as loan rate, payment options, maturity date and amortization of principal.  When applying for a mortgage loan, borrowers are placed into three major categories: (1) prime; (2) subprime; and (3) Alt-A.

### a.     Prime Mortgage Loans

63. Prime mortgage loans are of high quality.  Lenders use the Fair Isaac & Company ("FICO") credit scoring system (in which a borrower is assigned a FICO score ranging from 300 to 850) to determine what borrowers are qualified are prime loans.  Generally, a borrower with a FICO score of greater than 620 is considered eligible for a prime loan.  However, past payment history, bankruptcy, foreclosure, and loan-to-value ratio are also considered.

### b.     Subprime Mortgage Loans

64. Subprime mortgage loans are issued to borrowers with low or deficient credit scores who do not qualify for a loan under conventional credit criteria.  Subprime loans are riskier than prime loans and subprime borrowers pay higher interest rates proportionate to the higher credit risk.

65. In 2004 and 2005, subprime loans began to proliferate due to a confluence of factors including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.  *See* Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot., *Testimony Before the Committee on Banking, Housing and*

*Urban Affairs, U.S. Senate:   Federal Deposit Insurance Corporation on Mortgage Market Turmoil:  Causes and Consequences,* Mar. 22, 2007, *available at*

http://www.fdic.gov/news/news/speeches/archives/2007/chairman/spmar22071.html

66.  In 2006, lenders made $640 billion in subprime loans, nearly twice the value of subprime loans made in 2003.  *See Inside B&C Lending.  See New Century Files for Chapter 11 Bankruptcy*, CNNMoney.com, April 3, 2007 *available at*

http://money.cnn.com/2007/04/02/news/companies/new_century_bankruptcy/

67.  In 2006, subprime lending amounted to approximately 20 percent of the nation's mortgage lending and approximately 17 percent of homes were purchased subject to subprime mortgages.  *Id.*

### c.      Alt- A Mortgage Loans

68.  Alt-A mortgage loans fall between prime and subprime loans. Alt-A borrowers generally have a clean credit history but may have some qualities that increase the risk to the lender such as higher loan-to-value and debt-to-income ratios or inadequate documentation of the borrower's income. Typically, an Alt-A borrower was self-employed, had good cash flow, a higher FICO score and a good credit history but could not validate his income.

69.  Four hundred billion dollars of Alt-A loans were originated in 2006 and they accounted for 13.4% of all mortgages offered that year, according to *Inside Mortgage Finance*.

70. Although Alt-A loans were intended to be less risky than subprime loans, Alt-A products were actively marketed to subprime borrowers so that the practical difference between Alt-A and subprime loans was virtually eliminated.

18

**B.** **Lehman's Involvement in the Mortgage Market**

71. Although Lehman occasionally acted as a lender in the real estate market, its primary involvement was in the securitization of mortgages. This type of securitization, commonly known as a mortgage backed security ("MBS"), is widely seen as a way to spread credit risk to investors.

72. Further, MBSs were split and securitized in secondary securitizations called collateralized debt obligations ("CDOs").

73. MBSs contained Alt-A and subprime mortgages in addition to high-quality prime loans. Without the MBS structure, there was no market for the resale of subprime/Alt-A loans or securities. Thus, the MBS structure permitted lenders to move non-prime mortgages off of their books, which freed up capital so that they could issue more non-prime loans.

74. Importantly, when a securitizer, such as Lehman, sold a MBS it often agreed, unbeknownst to investors, to buy back any non-performing loans. It was, therefore, of paramount importance for Lehman to remain fully informed as to the performance of mortgages making up its loan pools through detailed investigation and observation.

75. This task was difficult, however, due to the mortgage lending practices that permitted borrowers to enter into mortgages with wholly inadequate, or down-right falsified, credit information.

76. Although there were great profits to be made in the securitization and sale of MBS s, the downside occurred when the loans failed to perform.

77. Lehman understood the MBS structures, had access to information concerning the risk associated with the security and knew about the problems facing the real estate market as early as

2004.  However, Lehman, failed to inform investors of the true nature of the securities in which it was involved and actively hid its exposure to the mortgage market.

### 1.  Lehman as Leader in CDO Market

78.  Lehman originated approximately $60 billion in residential mortgages during 2006 and $47 billion during 2007.  In addition to being heavily involved in the residential mortgage backed securities ("RMBS") market, Lehman was also a leader in the commercial mortgage market.  As of March 2008, Lehman had more commercial mortgage holdings than any other firm, beating its nearest competitor, Citigroup, by $10 billion and more than doubling the commercial mortgage holdings of Morgan Stanley, Bear Stearns, and J.P. Morgan.  According to a September 15, 2008, *Bloomberg* report, Lehman wrote more mortgage-backed securities than any other firm in 2007 and was a leader in underwriting commercial mortgage-backed securities ("CMBS").  Lehman held more than $38.9 billion in commercial mortgages in 2007 and originated $60 billion in commercial mortgages that same year.

79.  Although Defendant Fuld, after Lehman's collapse, characterized Lehman as a victim in the credit market, Lehman was responsible, through its subsidiaries, for originating many of the troubled subprime and Alt-A loans that eventually caused its downfall.

### 2.  Aurora Loan Services:  Lehman's Alt-A Mortgage Lender

80. In 2003, Lehman acquired Aurora Loan Services ("Aurora"), a residential loan originator and servicer of predominately Alt-A mortgages.  Upon information and belief, all of Aurora's mortgage production was funneled to Lehman and provided a source of loan product for Lehman's securitization pipeline.  Aurora became one of the nation's largest loan originators and loan-servicing companies.

20

81. On July 15, 2003, Lehman filed a form 10-Q reporting its acquisition of Aurora and boasting that "Aurora adds long term value to our mortgage franchise by allowing further integration of the business platform." Although Lehman purchased pools of loans from originators such as Countrywide, New Century, American Home Mortgage and Washington Mutual, a portion of the inferior loans that ultimately led to its downfall were issued by Aurora.

82. Although Aurora characterized its mortgages as Alt-A loans, upon information and belief, Aurora issued loans to individuals with FICO scores in the low 300s and allowed individuals to obtain mortgages with no documentation requirements.[8] Such loans were more appropriately characterized as subprime

### 3.     BNC Mortgage:  Lehman's Subprime Mortgage Lender

83. In 2004, Lehman purchased BNC Mortgage ("BNC") as a wholly owned subsidiary. BNC issued subprime mortgages and Lehman described BNC as its "subprime origination platform." Upon information and belief, BNC sold roughly 75% of its production to Lehman, and as 2007 progressed and the market for non-prime loans deteriorated, Lehman purchased an even higher percentage of BNC's loans.

84. Although subprime mortgages were risky, Lehman's stated concern was not with the performance of individual mortgages but with securitizing the loans and then selling those securities. However, when the risky loans began failing, Lehman was required to repurchase them subject to an undisclosed (to Lehman  investors) repurchase agreement.

85. Lehman's involvement with Aurora, BNC and other mortgage originators left it highly exposed to the deteriorating real estate market, although that exposure was hidden from investors. Even as the real estate market began its decline, Lehman failed to inform investors of its significant exposure.

---

[8] The median FICO score in the United States at the time was 723.

4.       **Requests for Loan Repurchases**

86. Upon information and belief, in late 2006, many of the loans acquired by Aurora went into default immediately upon acquisition and Lehman was faced with repurchase requirements from its securitizations as a result of those defaults.

87. Aurora attempted to pass on those repurchase obligations by asking the original lender to make the repurchase.

88. Upon information and belief, Aurora's auditors, in 2006, reviewed sample loans of two entities from which Aurora sought repurchase monies.  Upon information and belief, the auditors determined that 40% to 50% of the loans reviewed had material misrepresentations.   Upon information and belief, later that year, the auditors reviewed another sample and found that 72% to 73% of the loans contained misrepresentations and that 70% of the loans should be re-purchased.

89. However, Aurora had difficulty getting various lenders to repurchase bad loans and Lehman actually began suing lenders for refusing to repurchase troubled loans as early as June 2006.  Lehman's inability to enforce its own repurchase requests evidences the decrease in the value of the non-prime loans and Lehman's knowledge that these loans were problematic.

90. Nevertheless, upon information and belief, Aurora did not cease doing business with its subprime/Alt-A lenders because Aurora needed to meet Lehman's securitization needs. Furthermore, upon information and belief, Aurora even continued to do business with lenders which already had large numbers of outstanding unpaid repurchase claims.

91. Despite the confirmation that Lehman, through Aurora, was purchasing huge amounts of troubled assets, Lehman still did not disclose this liability to investors nor did Lehman disclose the risk these loans posed to Lehman's assets.  Further, upon information and belief

Aurora began issuing subprime loans in mid-2004, but labeled them as Alt-A loans. Lehman had full knowledge of the fraud that was occurring at Aurora.

92. Although Lehman clearly knew that the subprime and Alt-A loans it was securitizing were problematic and that its exposure was increasing, Lehman was not concerned with the risks associated with these loans. Lehman's business model was designed to originate and distribute (not hold) loans in the form of MBSs. Its model did not account for or intentionally ignored the risk of holding the loans.

93. On February 6, 2008, Defendant Erin Callan, CFO of Lehman, clarified Lehman's MBS model:

> We didn't look at participating in the residential mortgage market as taking a directional bet one way or the other. We looked at it as a business where we could take a spread out of this originating to distribute.
>
> If you have that mindset, your inclination then is to hedge whatever inventory you get long, until the timeframe to which you can distribute the inventory through a securitization or otherwise. That was our model.
>
> It doesn't come from Goldman's model of taking a proprietary bet, or Morgan Stanley's model, or even Merrill's model of warehousing a significant amount of product. It just comes from a basic focus and philosophy that we really didn't want to go long the product or short the product. We wanted to originate to distribute and we hedged that origination capability.

94. Although Lehman did not look at participating in the market as a directional bet one way or the other, Lehman was well aware of the problems it faced in originating risky loans and distributing them to buyers due to the repurchase agreements that accompanied the securities.

**5.      Lehman's Competitors Face Difficulties in the Real Estate Market**

95. On May 3, 2007, UBS announced that its in-house hedge fund, Dillon Reed Capital Management, would be shut down because of the problems befalling its mortgage portfolio.

Additionally, two of Bear Stearns' hedge funds, Enhanced Leverage Fund and High-Grade Fund, were experiencing unprecedented declines in value due to their failing mortgage portfolios.

96. In response to the problems experienced by UBS and Bear Stearns, rumors began circulating regarding the strength of Lehman's financial position.  On July 18, 2007, Lehman spokesperson Kerrie Cohan attempted to reassure its investors and the public that, "the rumors regarding Lehman's subprime exposure are totally unfounded."  Cohan, however, did not disclose that Lehman's involvement with Aurora and BNC created significant and extremely risky exposure to the subprime market.

97. On August 14, 2007, with news that Bear Stearns' hedge funds were collapsing, the Dow Jones News Service reported:

> Lehman and Bear Stearns tend to be twinned in investors' minds, because they are smaller and less diversified than Wall Street giants Goldman, Merrill Lynch & Co. and Morgan Stanley.  Yet Lehman is seen as taking more risk than Bear Stearns.  And in the current environment, Lehman may be paying a price for its relative silence about its exposure to troubled mortgages and high-risk debt.

98. Bear Stearns saw its final days in March 2008 as a result of its exposure to the real estate market.  Despite financial media reports indicating that Lehman's exposure was greater than Bear Stearns', Lehman continuously denied problems and failed to report the extent of its investment in the non-prime market even as its competitors failed.

99. Clearly, Lehman, the Officer Defendants, and Director Defendants were aware of the risk involved in the non-prime market and Lehman's exposure to that risk, but concealed the information from the public and its investors.

### 6. Lehman's Hidden Exposure to a Failing Real Estate Market

#### a. Rising Foreclosure Rates

100. Beginning in 2005, the number of foreclosures steadily increased on a national basis. RealtyTrac's 2005 U.S. Foreclosure Market Report showed a 25% increase in foreclosures from the first through the fourth quarter of 2005.

101. In the first quarter of 2006, RealtyTrac reported a 38% increase from the previous quarter and a 62% increase from the first quarter of 2005.

102. A January 25, 2007 report from RealtyTrac showed that 2006 foreclosures had increased another 42% over 2005's levels.  Even as the real estate market slid further down in 2005 and 2006, Lehman continued to add to its holdings of mortgage-related assets.  Lehman increased its mortgage related portfolio by 54%, from $57.7 billion in 2006 to over $89.1 billion in 2007.

#### b. Lehman's Failure to Report Subprime and Alt-A Exposure

103. In a March 14, 2007, conference call regarding the real estate market, Defendant O'Meara boasted that Lehman was "well positioned to benefit from this evolving situation given [its] experience in this sector as well as [its] ample liquidity and risk management practices" and that Lehman expected "to see various opportunities as a result of the market dislocations." Defendant O'Meara stated that Lehman saw "the subprime challenges as being a reasonably contained situation."

104. Although Lehman was highly invested in the Alt-A and subprime mortgage markets, Lehman failed to disclose to its investors its exposure to these markets.  Lehman  reported its mortgage related assets collectively until 2008 when, for the first time, it broke out its subprime (but not its Alt-A mortgages) as a separate line item in its quarterly filings with the SEC.

105. Plaintiffs were not informed that most of Lehman's mortgage related assets were primarily risky Alt-A loans until after they had invested $21 million in Lehman securities.

106. In fact, Lehman's SEC filings for the second quarter of 2007 failed to disclose any details regarding its mortgage-related holdings and write-downs.

107. In the March 14, 2007 conference call, Defendant O'Meara continued to reassure investors stating that "when you think about the subprime business, itself, it is not something that's going to itself create a big event in the economy." O'Meara went on to add, "In the U.S. sub-prime space, we have adhered to our origination standards.  In terms of origination, we remain far more active in the prime and Alt-A, which accounted for 75% of our origination volumes in the current quarter.  From a balance sheet perspective, we believe we are well protected.  We actively hedged the interest rate and credit components of our inventory positions, including our non-investment grade retained interest and securitizations, **the majority of which are prime mortgage related."**  (emphasis added).

108. A year later, on a March 18, 2008, conference call, Defendant Callan admitted for the first time that Lehman's securitizations, were "primarily Alt-A" and that there was only "a pretty small component of prime."   She further revealed that within the Alt-A/Prime residential mortgages, "if there's $1 billion of the $14.6 billion Alt-a/Prime, that's probably the most that's in there."

109. The very next day, Sanford C. Berstein & Co. LLC analyst Brad Hintz suggested that Lehman had $87 billion in "troubled" assets that would probably cause Lehman more losses.  He stated:

> For the first time in its earnings release, Lehman provided a detailed breakdown of its balance sheet exposure to troubled asset classes…Regrettably, the picture was not pretty… Until these troubled assets are removed from Lehman's balance

26

sheet, we would expect the firm will be exposed to further write downs in the upcoming quarters.

110.  Three months later, in *Bloomberg News* on June 10, 2008, David Einhorn, president of Greenlight Capital, opined that Lehman knew about the problems it was facing in the mortgage market long before it broke down its balance sheet to expose the troubled assets:

> The burden is on [Lehman] to be much more forthcoming and transparent in their disclosures and discussion and analysis of their high-risk assets…This confirms a lot of things we've been saying.  The credit market did not really deteriorate between February and May.  Most of these losses were probably evident quarters ago.

111.  As the market for subprime and Alt-A mortgages declined, Lehman failed to provide the extent of its Alt-A and subprime securitized assets to its investors. Instead Lehman reported that the situation was "reasonably contained."  This failure to disclose harmed Plaintiffs.

### c.  Lehman's Lack of Risk Controls

112.  With the decline of the housing market, some Lehman risk managers began to recognize and criticize Lehman's risk management and mortgage-related holdings.  However, according to *Bloomberg Markets*, two such employees, Michael Gelband, head of Lehman's Fixed Income Division, and Madelyn Antoncic, Lehman's Chief Risk Officer, were "pushed aside" after they "urged caution" regarding Lehman's mortgage positions.   Ms. Antoncic was moved to a government relations job in September of 2007 and Mr. Gelband reportedly left Lehman's Fixed Income Division in May 2007, after he "balked at taking more risk."[9]

113.  Lehman gave free reign to Mark Walsh, head of Lehman's Global Real Estate Group, in the issuance of residential and commercial mortgages unbeknownst to the public at the time. Walsh was exempted from Lehman's risk management controls and "[t]here were reportedly capital committees and processes underway that everyone else had to go through and Walsh

---

[9] *Lehman Faul- Finding Points to Last  Man Fuld as Shares Languish*, Bloomberg Markets, July 22, 2008

didn't have to go through them."[10]   Unlike other investment firms where responsibilities were divided among several individuals, Mr. Walsh was in charge of all aspects of Lehman's real estate operations.

114.   Despite its lack of even basic risk controls, Lehman nevertheless continued to reassure investors that its risk to the non-prime market was actively hedged throughout the market meltdown and that it was in a position to surpass market conditions.   However, in reality there was no direct hedge for the Alt-A mortgages which comprised the majority of Lehman's mortgage portfolio.

115.   On July 10, 2007, Lehman filed its 10-Q for the second quarter of 2007.   Defendant Christopher O'Meara signed the report revealing record net revenues, net income and diluted earnings per share.   The 10-Q claimed that Lehman had internal control measures in place to monitor and limit risk:

> We utilize a number of risk measurement methods and tools as part of our risk management process.  One risk measure that we utilize is a comprehensive risk measurement framework that aggregates market event risk and counterparty risks. Market event risk measures the potential losses beyond those measured in market risk such as losses associated with a downgrade for high quality bonds, defaults of high yield bonds and loans, dividend risk for equity derivatives, deal break risk for merger arbitrage positions, defaults for mortgage loans and property value losses on real estate investments.

116.   Lehman was required to disclose credit risk associated with its financial instruments:[11]

> [A]n entity shall disclose all significant concentrations of credit risk arising from all financial instruments, whether from an individual counterparty or groups of counterparties.   Group concentrations of credit risk exist if a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic conditions.   The following shall be disclosed about each significant concentration:

---

[10] *New York Observer*, September 30, 2008.

[11] FAS 107, *Disclosures About Fair Value of Financial Instruments* ("FAS 107"), as amended by FAS 133, *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133").

    a.  Information about the (shared) activity, region, or economic characteristic that identifies the concentration

    b.  The maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed to completely to perform according to the terms of the contracts and the collateral or other security, if any, for the amount due proved to be of no value to the entity

    c.  The entity's policy of requiring collateral or other security to support financial instruments subject to credit risk, information about the entity's access to that collateral or other security, and the nature and a brief description of the collateral or other security supporting those financial instruments

    d.  The entity's policy of entering into master netting arrangements to mitigate the credit risk of financial instruments, information about the arrangements for which the entity is a party, and a brief description of the terms of those arrangements, including the extent to which they would reduce the entity's maximum amount of loss due to credit risk.

117. In the second quarter of 2007, Defendant O'Meara stated that Lehman "do[es] have hedging strategies that are in place and have proven to be quite effective." However, Defendant O'Meara never disclosed what those strategies were and wholly failed to disclose Lehman's inability to directly hedge Alt-A loans, contrary to previous statements.

118. On November 14, 2007, Defendant Lowitt, while at the Merrill Lynch Banking and Financial Services Conference, repeated Lehman's hedging mantra and stated in a presentation that "[w]e've had success in our hedging and so we don't believe that there will be any requirement for substantial markdowns and certainly no requirement for us to announce anything.  We're very comfortable with where we are with regard to that."

119. Defendant Lowitt's presentation caused a Punk Ziegel & Company analyst to comment:

> Unlike numbers of its competitors, Lehman suggested that there will not be meaningful mark down.  In fact, the company suggested that it was short many of the offending securities.  This would mean that Lehman could make money where others are losing.

However Lehman went beyond these assertions suggesting that it had no major losses in the impacted areas for the industry. The company argued that it business is benefiting from the problems surfacing elsewhere. In essence, as customers move their accounts away from impacted firms, Lehman along with Goldman Sachs is getting the business.

120. Clearly, analysts were reassured by Lehman's statements regarding hedging. Analysts' reports impacted *Bloomberg's* reporting on Lehman and Plaintiffs relied on *Bloomberg* among other financial reports in purchasing Lehman securities.

121. Additionally, Lehman's 2007 10-K contained representations regarding Lehman's risk management:

> Our goal is to realize returns from our business commensurate with the risks assumed. Our business activities have inherent risks that we monitor, evaluate and manage through a comprehensive risk management structure. These risks include market, credit, liquidity, operational and reputational exposures, among others.
>
> The bases of our risk control processes are:
>
> - We establish policies to document our risk principles, our risk capacity and tolerance levels.
> - We monitor and enforce adherence to our risk policies.
> - We measure quantifiable risks using methodologies and models based on tested assumptions.
> - We identify emerging risks through monitoring portfolios, new business development, unusual or complex transactions and external events and market influences.
> - We report risks to stakeholders.

122. On February 6, 2008, Defendant Callan continued to reassure investors, in a Credit Suisse Financial Services Forum, of Lehman's superior risk management including the active hedging of its residential mortgage book.

123. As a result, Credit Suisse analyst Susan Roth Katze reported that "[m]anagement's comments ought to increase confidence that such outperformance can continue" and stated that Lehman "differentiated itself" in terms of risk management expertise in 2007.

30

124. In a March 18, 2008, conference call regarding Lehman's first quarter 2008 financial reports, Defendant Callan stated that Lehman's "continued diligence around risk management discipline allowed [it] to avoid any single outsize loss" during the quarter.  Defendant Callan also discussed the mark-to-market adjustments Lehman recorded during the quarter, stating:

> The gross revenue reduction, gross numbers for the quarter, from mark to market, pre-hedges, was approximately $4.7 billion.
>
> After hedges, we had a net impact of 1.8 billion, which I think is a pretty good testament to our **hedging and risk mitigation capabilities** that are core to our franchise.
>
> So let me speak a moment about the composition of the net 1.8 write-down. Residential mortgage related positions accounted for 800 million, net.  The 800 million net relates to 3 billion gross.  So I think it's fair to say **we continue to do a very, very good job managing the risk on residential mortgages**, an area that I think we're credited with a lot of expertise, a great franchise.

(emphasis added).

In speaking about Lehman's exposure to failing market conditions, Defendant Callan commented on both Lehman's increasing exposure to the Alt-A assets and Lehman's hedging activities:

> Prime and Alt-A make up 14.6 billion versus 12.7 at year end.  Again reflecting a fair amount of assets and bought opportunistically, and also includes a meaningful component of servicing which we added during the quarter, which really does reflect a very natural hedge for the mortgage asset class.

125. During that conference call, UBS analyst Glenn Schorr asked Defendant Callan to provide more detail regarding certain temporary, as opposed to permanent, asset mark downs. Defendant Callan responded saying:

> Yeah, the activity really in purchases and sales took place in resi's.  Close to 2 billion between sales and purchases in that asset class, and really in the Alt-A space.  We saw a great opportunity in what happened with Alt-A pricing, around the [Pelitan] fund, execution, transaction around that situation.  So we were excited to have the ability to have some dry powder there and to get up the sale of some other assets, other agency-related product in order to buy what we thought was Alt-A at a very good price.

> We are very well hedged.  I mean, it's always a little challenging how you look at it, we would consider ourselves at this point net short in the residential asset class.

Schorr responded:

> Net short in resi.  So that would mean that wherever you bought it, to find a reasonable market, so you marked the whole portfolio down, and then the 10 points that we fell in the quarter, in March so far, you're kind of numb to it because you're hedged there still.

Defendant Callan replied, saying:

> Exactly.

126.  However, despite Lehman's repeated assurances that its mortgage related assets were well hedged, Defendant Lowitt finally confessed on a September 10, 2008 conference call that there is no direct hedge for Alt-A mortgages, which made up a majority of Lehman's mortgage related assets.  By that time, though, the damage to the Plaintiffs had been done.

### d.    Lehman's Improper Valuation of Assets

127.  The Financial Accounting Standards Board ("FASB") requires that all material information be disclosed which is necessary to ensure that it validly represents underlying events and conditions.

128.  FASB is an organization that develops generally accepted accounting principles ("GAAP").  GAAP is the standard framework of guidelines for financial accounting used in the United States and includes the standards, conventions, and rules for accountants to follow in recording and summarizing transactions and in the preparation of financial statements.  SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes or other disclosures.

129.  GAAP requires reporting by means of fair value accounting.  Fair value accounting is financial reporting which requires a company to measure certain assets and liabilities "at

estimates of the prices they would receive if they were to sell the assets or would pay if they were to be relieved of the liabilities." In September 2006, FASB issued a new standard, Statement of Financial Accounting Standards No. 157 (FAS 157). FAS 157 establishes a framework for measuring fair value in GAAP, expands disclosures about fair value measurements and provides more comprehensive guidance to aid companies in estimating fair values. The disclosures focus on the inputs used to measure fair value and for recurring fair value measurements using significant unobservable inputs.

130. FAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."[12] FAS 157 emphasizes that fair value is market-based rather than entity-specific.

131. FAS 157 provides for several methods of calculating fair value and establishes a hierarchy based on quality and reliability of information. Quoted prices are the most reliable valuation inputs while model values based on unobservable data are the least reliable.

132. According to FAS 157:

> The notion of unobservable inputs is intended to allow for situations in which there **is little, if any, market activity for the asset or liability at the measurement** date. In developing unobservable inputs, the reporting entity need not undertake all possible efforts to obtain information about market participant assumptions. However, the reporting **entity shall not ignore information about market participant assumptions that is reasonably available** without undue cost and effort. Therefore, the reporting entity's own data used to develop unobservable inputs shall be adjusted if information is reasonably available without undue cost and effort that indicates that market participants would use different assumptions.

*Id.* (emphasis added).

133. In addition to the FAS guidelines, the SEC's Staff Accounting Bulletin No. 59 ("SAB 59"), Accounting for Noncurrent Marketable Equity Securities, specifies that "[a]cting upon the

---

[12] Statement of Financial Accounting Standards No. 157, Fair Value Measurements

premise that a write-down may be required, management should consider all available evidence to evaluate the realizable value of its investment."

134. Fair values are less accurate when they are mark-to-model rather than mark-to-market values because firms are given discretion in valuing these positions. Mark-to-market valuations entail recording the price or value of a security, portfolio or account to reflect its current market value rather than its book value. On the other hand, mark-to-model involves pricing a specific investment position or portfolio based on internal assumptions or financial models.

135. The goal of fair value measurement is to provide a best estimate of the prices at which assets or liabilities would change hands based on current information and conditions. Companies may use a mark-to-market valuation method if there are similar positions available in the market. However, if observable inputs are unavailable, a mark-to-model approach may be used with firm-supplied inputs (such as expected cash flows developed using the firm's own data).

136. FASB classifies assets into Level 1, Level 2, and Level 3. Level 1 assets can be valued with accuracy because they have clear market prices. Level 2 assets are valued based on quoted values in inactive markets or on models. The inputs used in Level 2 models are observable. Level 3 assets are valued based on unobservable data and are based on management's own assumptions and expectations.

137. Lehman misled investors when it valued its mortgage securities as Level 3 assets even though there were observable inputs that would permit it to value the assets at Level 2, and thus give meaningful disclosure to investors. Lehman's use of Level 3 asset valuation was intentional, misleading and false.

### i.   Observable Inputs for Fair Value Accounting

138.  Observable inputs for mortgage-related assets include the ABX and CMBX indices. The ABX Index is a series of credit-default swaps based on 20 bonds that consist of subprime mortgages. The ABX index was created in January 2006 and serves as a benchmark of the market for securities backed by home loans issued to borrowers backed by weak credit.  The ABX emerged as a substitute for real market prices on subprime bonds since these assets rarely trade thus making them difficult to value.

139.  According to The White Paper, *Measurements of Fair Value In Illiquid (Or Less Liquid) Markets,* "[T]he pricing indicated by the ABX credit derivative index for subprime mortgage bonds may be a Level 2 input when used as input to the valuation of a security backed by subprime mortgage loans."[13]

140.  CMBX derivatives are a group of indices made up of 25 tranches of commercial mortgage-backed securities ("CMBS"), each with different credit ratings. The CMBX indices, like the ABX index, provides insight and transparency into CMBS.

141.  Even though the ABX and CMBX are observable inputs and are meant to create visibility and transparency into the subprime market, Lehman nevertheless continued to value its mortgage-related assets as Level 3 instead of properly valuing them at Level 2.

142.  As noted by Bernstein analyst Brad Hintz, improperly categorizing assets as Level 3 is a means of falsifying valuation.

### ii.   Lehman's Increased Level 3 Assets

143.  Labeling mortgage backed securities as Level 3 assets permitted Lehman discretion in valuing those assets.

---

[13] AICPA White Paper, *Measurements Of Fair Value In Illiquid (Or Less Liquid) Markets*

144. A February 8, 2007 *Bloomberg* article reported that the ABX declined 10% since its introduction.[14]   Another *Bloomberg* article reported that the ABX index tracking derivatives linked to subprime mortgage securities with the *highest* investment-grade ratings had fallen more than six percent in June of 2007 and the index tracking subprime mortgages with the *lowest* investment-grade ratings had declined thirty percent.[15]

145. As Lehman increased its Level 3 assets each quarter, the ABX showed a substantial decline in the value of subprime residential mortgage-backed securities throughout 2007 and the CMBX indicated increasing risk in commercial mortgage-backed securities.

146. Despite improperly valuing assets as Level 3, Lehman represented in its third quarter 10-Q for 2007 that "it measure[s] financial instruments and other inventory positions owned…at fair value."  The third quarter 2007 report also stated:

> During the 2007 three months, Level III assets increased to 12% of total Financial instruments and other inventory positions owned and measured at fair value, compared to 8% in the trailing quarter. **The increase in Level III assets resulted largely from the reclassification of approximately $9.8 billion of assets previously categorized as Level II assets into the Level III category** in the third quarter of 2007.  Reduced liquidity in the capital markets resulted in a decrease in the observability of market prices for certain financial instruments, particularly for mortgage products.

(emphasis added).

147. Even while Lehman was reporting these assets as Level 3, its own personnel were admitting that there was visibility in the market.  On a December 13, 2007 conference call, Defendant O'Meara expressly stated:

> As you move down the capital structure, there aren't transactions being executed, maybe there are some, but it's not as visible and not as much information on it and so the way to model them out is you have to default to the information that is visible which is the index trading around ABX in the different parts of the capital structure for ABX and so those inputs or that information around the ABX is used

---

[14] *Subprime Mortgage Bond Risks Surge, Index Suggests,* Bloomberg, May 3, 2007.
[15] *Bear Stearns Halts Redemptions on Third Hedge Fund*, Bloomberg, July 31, 2007.

to price out the cash products in the bottom parts of the capital structure.  But there are some trades being done.  **We've got good visibility into them**.

(emphasis added).

148.  On the March 18, 2008, conference call, Defendant Callan reiterated Lehman's assertion that its valuations were transparent and stated "[W]e began to see a lot more transparency in the Alt-A sector late in the quarter, allowing us to mark positions based on observable prices." [16]

149.  However, Defendant Callan also represented in this same conference call:

> [A]t the end of the year we were about 38.8 [billion] in total Level 3 assets.  In terms of what happened in Level 3 asset changes this quarter, we had net sort of payments, purchases, or sales of 1.8 billion.  We had net transfers in of 1.1 billion.  **So stuff that was really moved in or recharacterized from Level 2**.  And then there was about 875 million of write-downs.  So that gives you a balance of 38,682 as of February 29.

(emphasis added).

150.  On a June 16, 2008, conference call, Defendant Fuld touted Lehman's visibility by stating that it "had the benefit of much greater price visibility, due to the number of assets that were sold, especially in the commercial and residential mortgage area."

151.  On that same call, Defendant Lowitt confirmed Lehman's ability to observe the market:

> Although certain sectors of the markets are currently distressed, there has been recent sales activity in many asset classes, allowing us to benchmark prices.  The strong flows we've seen over the past quarter **have given us very good transparency** in the marks we have against our remaining positions.

(emphasis added).

152.  Although Lehman repeatedly claimed that there was good visibility and transparency into the mortgage market, Lehman continuously moved its assets from Level 2 to Level 3. Lehman reported 7.55% of its assets as Level 3 for the first quarter of 2007, 8.48% in the second quarter of 2007, 12.74% in the third quarter of 2007, 14.98% in the final quarter of 2007, 15.1%

---

[16] Callan was referring to the fourth quarter of 2007.

in the first quarter of 2008, and finally Level 3 assets reached 17.01% by the second quarter of 2008.

153. Lehman also continuously increased its percentage of mortgage and asset-backed securities which it categorized as Level 3.  In the second quarter of 2007, 12.5% of Lehman's assets were categorized as Level 3 increasing to 25.9 in the third quarter of 2007, 28.3% in the fourth quarter of 2007, 28.1% in the first quarter of 2008, and 28.4% in the second quarter of 2008.  Over the course of one year, Lehman's Level 3 mortgage and asset-backed securities increased nearly 14% while Lehman reported increased visibility.

### e.     Lehman's Failure to Take Appropriate Write-downs

154. As the market for subprime mortgages began its steep decline, Lehman did not take substantial write-downs like its competitors even though Lehman had more exposure to the subprime and Alt-A market.  Write-downs involve reducing the book value of an asset because it is overvalued compared to the market value. This usually acts to reduce net income. As discussed above, the ABX showed an increase in the risk of subprime assets.  However, Lehman failed to take write-downs consistent with its competitors and the ABX index.

155. As the real estate market continued its decline in 2007, Lehman's competitors made substantial write-downs in order to reflect market prices.  Lehman had nearly triple the mortgage related assets of Merrill Lynch and more than five times as many mortgage backed securities as Citigroup, yet in the first quarter of 2007, Lehman took only a fraction of the write-downs those two companies posted.

156. In the first quarter of 2007, Citigroup and Merrill Lynch both announced significant losses.  Merrill Lynch reported a $1.97 billion loss while Lehman posted a profit of $489 million.  In the third quarter of 2007, Lehman reported $88 billion in mortgage-related assets.  On

September 18, 2007, Lehman announced $700 million in write-downs. During that same quarter, Merrill Lynch reported $7.9 billion in write-downs leaving $20.9 billion in mortgage-related assets. Citigroup disclosed $5.9 billion in losses on $15.3 billion in mortgage-backed securities. UBS wrote down approximately $3.7 billion on its mortgage-backed securities.

157. Furthermore, the $700 million in write-downs reported by Lehman were calculated net of hedges. On September 18, 2007, Defendant O'Meara was asked directly to specify the amount of gross write-downs but he refused to answer saying "knowing the gross numbers particularly in that business, I don't think is a really meaningful thing."

158. However, given that Lehman later admitted that there was no direct hedge for Alt-A products, the importance of the gross amount of write-downs taken by Lehman was significant. Nevertheless, Lehman continued its steadfast refusal to provide meaningful insight into its MBS exposure.

159. In the fourth quarter of 2007, Lehman wrote down its mortgage-related portfolio by $1.5 billion, net of hedging gains, on a $70 billion portfolio. However, Citigroup wrote down $17.4 billion. Merrill Lynch took write-downs of $9.9 billion of approximately $14.7 billion in asset-backed CDOs and $1.6 billion in write-downs related specifically to subprime residential mortgages. UBS announced it would take write-downs of $10 billion as a result of its subprime exposure.

160. In the first quarter of 2008, Lehman took a $200 million write-down on $6.5 billion of CDOs which included $1.6 billion of below investment grade pieces. Below investment grade loans have a credit rating below BBB and are also referred to as "junk bonds." The chart below displays Standard & Poor's credit ratings. A loan with a credit rating below BBB is considered "high risk."

39

| Bond Rating Standard & Poor's | Grade | Risk |
|---|---|---|
| AAA | Investment | Lowest Risk |
| AA | Investment | Low Risk |
| A | Investment | Low Risk |
| BBB | Investment | Medium Risk |
| BB, B | Junk | High Risk |
| CCC/CC/C | Junk | Highest Risk |
| D | Junk | In Default |

161. On March 18, 2008, Lehman's first quarter results revealed $800 million and $700 million in write-downs, net of hedging, in residential and commercial mortgage holdings respectively. David Einhorn pointed out in a presentation that market prices of comparable structured products fell much further in the quarter. When Einhorn confronted Defendant Callan with this information, she did not have a response. In a later email to Einhorn, Defendant Callan still did not have an explanation, but stated that Lehman "would expect to recognize further losses" in the next quarter.[17]

162. Moreover, although in the first quarter of 2008, Lehman recognized only a $1.1 billion gross write-down of its commercial real estate portfolios, or 3%, the index of "AAA" CMBSs fell approximately 10% while lower rated securities fell an even greater percentage.

163. On March 20, 2008, an article in *Conde Nast Portfolio*, reported:

> Lehman's write-downs seem tiny. Lehman finished the quarter with $87.3 billion of real estate assets. These include residential mortgages and commercial real estate paper. The bank only wrote these assets down by 3 percent. And its Level III assets – the hardest to value portion of these instruments – were written down by only the same percentage. The indexes and publicly traded instruments and companies that serve as proxies for these securities generally fell more than that in the quarter.

---

[17] Ira W. Sohn Investment Research Conference, David Einhorn, Greenlight Capital, *Accounting Ingenuity*, May 21, 2008.

164.  Finally, five days before filing for bankruptcy, Lehman pre-announced $7 billion in gross write-downs of its mortgage related holdings for the third quarter of 2008. This information was too little too late for Plaintiffs as, by this time, the Plaintiffs had already invested $21 million in securities.

**f.      Lehman's Overvaluation of its Assets**

165.  Although Lehman claimed that its real estate portfolio was valued properly, on June 10 2008, analyst, Douglas Sipkin, released a report titled "Too many inconsistencies" and stated:

> We underestimated how poorly marked [Lehman's] assets were.  In addition, the larger capital raise at meaningfully lower prices indicates that the Company did not have, and potentially still does not have, a complete grasp of its exposures.

166.  Although Lehman claimed that its real estate portfolio was properly valued, Wall Street executives who reviewed Lehman's real estate portfolio said it was overvalued by more than $10 billion.[18]  Two Wall Street executives stated that they believed Lehman's real-estate valuations to be roughly 35% higher than they should be.  However, on Lehman's September 10, 2008 conference call, Defendant Lowitt stated that the real-estate assets had been "in and around our marks."

167.  Moreover, according to *The Wall Street Journal*, Lehman documents revealed that Lehman "marked" some European securities backed by real estate loans at 97.9% of par value, or nearly 98 cents on the dollar.  Lehman valued U.S. assets at 56 cents on the dollar when the European market was in a similar position with a declining market for these securities.  Thus, the European securities valuations were misleading.

168.  During an October 23, 2008 interview with *The New York Times*, Federal Reserve Chairman Ben Bernanke confirmed that the government would not lend money to Lehman because the value of Lehman's assets created "a huge hole" on the company's balance sheet.

---

[18] *The Two Faces of Lehman's Fall*, Wall Street Journal, October 6, 2008.

41

g.      **Lehman's Failure to Disclose its Lack of Capital and Liquidity**

169.  Lehman recognized its lack of capital, but continued to misrepresent to the public that its capital and liquidity positions were strong.

170.  Lehman's 2007 10-K stated:

> We maintain a liquidity pool available to Holdings that covers expected cash outflows for twelve months in a stressed liquidity environment.

171.  Furthermore, on a March 18, 2008, conference call, Defendant Callan stated, "[a]s we look out to the remainder of the year, we certainly will remain vigilant around risk, capital, and liquidity.  As we talked about last quarter, as a Firm we remain very cautious overall." Defendant Callan also reported that Lehman "took care of [its] full year needs" by raising $1.9 billion through its offering of preferred stock in February.

172.  Defendant Callan went on to say:

> And it's been our operating philosophy for a decade, which many people are very familiar with, that we remain closely focused on our liquidity, our long-term capital position, precisely for the purpose of weathering a difficult market environment that we've seen surfacing in recent weeks.  So we're set up for that.

> We had disciplined liquidity and capital management, which we consider to be a core competency, and maintained robust liquidity to date, and we've executed close to two-thirds of our full-year capital plan at the end of the first quarter.  And I will give you more details on that.

173.  On March 31, 2008, Lehman issued Preferred Stock.  On April 1, 2008, Lehman increased the preferred offering and Defendant Callan stated:

> [t]he significant oversubscription for this deal demonstrates the confidence that investors have in Lehman Brothers.  The success of the transaction is also reflective of the strength of the business model, the capital base and liquidity profile of the Firm as we continue to successfully weather challenging environments.

> So, I don't think there is any question on the part of our any of our counterparties or lenders that they will be repaid by Lehman Brothers.  I think there is a good debate that's being had about the investment banking sector, its return profile as we move forward in a lower leveraged environment.

174. On May 26, 2008, David Goldfarb, a top executive of Lehman, sent an email to Defendant Fuld discussing a possible deal with the Korean Development Bank to provide billions of dollars worth of capital to Lehman.  Goldfarb comments, "If we did raise $5 billion, I like the idea of aggressively going into the market and spending two of the five and buying back lots of stock and hurting Einhorn bad."[19]  Although Lehman was low on capital, Lehman was looking to buy back stock and punish a short seller instead of increasing its capital.

175.  On June 3, 2008, Judith Vale, a portfolio manager at Neuberger Berman, sent an email to the executive committee of Lehman.  The email expressed concerns with a lack of capital. The email specifically stated:

> (1)  Top management should forgo bonuses this year.
>
> This would serve a dual purpose.  Firstly, it would represent a significant expense reduction.  Secondly, when the "world" discovers this is next year's proxy, it would send a strong message to both employees and investors that management is not shirking accountability for recent performance.
>
> (2)  Do a partial spin-out of NB.
>
> A partial spin could be an attractive source of capital for Lehman, **at a time the company needs capital.**

*Emphasis added*.

176.  On June 9, 2008,  Benoit D'Angelin, a board affiliate of Lehman, sent an email to Hugh MaGee of Lehman, which was later forwarded to Defendant Fuld, stating:

> I am really worried that all the hard work we have put in over the last 6/7 years could unravel very quickly.  In my view two things need to happen very quickly.
>
> 1) some senior managers have to be much less arrogant and internally admit that some major mistakes have been made – Can t [sic] continue to say "we are great and the market doesn t [sic] understand."

---

[19] David Einhorn is the President of Greenlight Capital and gave a presentation on May 21, 2008 criticizing Lehman's financial reporting.

177.  However, only a week later, on June 16, 2008, Defendant Fuld stated "[o]ur capital and liquidity positions have never been stronger" and "we don't believe there will be any issues around capital."  Lehman documents, though, show that Lehman knew internally that "[with] a small number of investors accounting for a large portion of demand, liquidity can disappear quite fast" and noted that "very few of the top financial issuers have been able to escape damage from the subprime fallout."

178.  On September 9, 2008, according to *The Wall Street Journal*, Lehman calculated a need for at least $3 billion.  In addition, J.P. Morgan contacted Lehman requesting an additional $5 billion in collateral.  On September 10, 2008, Lehman released its third quarter 2008 results and reported a staggering $3.9 billion loss, as well as another $7.8 billion in gross write-downs on its residential and commercial real estate holdings.  On September 10, 2008, Defendant Fuld told investors that Lehman was on the right track to put the last two quarters behind them.  On that same day, Defendant Lowitt reported:

> I'll now provide an update on our liquidity position which remains very strong.
>
> We have maintained our strong liquidity and capital profiles even in this difficult environment and the potential sale of IMD further improves our capital position.
>
> Even under the scenario of limited debt issuing capacity in 2009 we anticipate that core Lehman will have ample cash capital to sustain its business opportunities.
>
> No, I think that – we think that clearly with out capital position at the moment is, it's strong.

179.  Five days later, Lehman filed for bankruptcy.

## C.    Lehman's Various Underwriters

180. Each of the Preferred J Underwriter Defendants, the ANICO Bond Underwriter Defendants, the ANTEX Underwriter Defendants and the Moody Foundation Underwriter Defendants underwrote, within the meaning of federal and state securities laws, the various

securities purchased by Plaintiffs and outlined below. In their capacity as underwriters they occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offerings in which they participated. Underwriters must exercise diligence of a type commensurate with the confidence, both as to integrity and competence, that is placed in them and must conduct a reasonable investigation into the offering in which they participate. By associating itself with a proposed offering, an underwriter impliedly represents that it has made such an investigation in accordance with professional standards. Investors properly rely on this added protection which has a direct bearing on their appraisal of the reliability of the representations in a prospectus. An underwriter who does not make a reasonable investigation is derelict in its responsibilities to deal fairly with the investigating public. By its participation in a sale of securities, an underwriter makes a recommendation that implies that the underwriter has a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents used in the offerings. In light of this duty to review and confirm the accuracy of the material in the documentation that it distributes, an underwriter impliedly makes a statement of its own to potential investors that it has a reasonable basis to believe that the information contained in the prospectus it uses to offer or sell securities is truthful and complete.

## D.     E&Y: Lehman's Auditor

181. Ernst & Young served as Lehman's auditor for several years and at all times relevant to Plaintiffs' claims. E&Y promoted itself as one of the foremost accounting firms in the world, with special expertise in real estate and sophistication in accounting for complex capital markets.

182. In fact, E&Y's website states that its Global Real Estate Center consists of dedicated professionals offering "deep technical experience" and promoted the firm's real estate investment trusts practice ("REITS") as a multi-disciplinary business combining the skills of

audit, tax, advisory and valuation professionals.  E&Y boasted that it provided services to 31% of all publicly traded REITS, to more than 50 leading real estate investment funds (including those sponsored by Lehman), and  to 7 of the 10 largest homebuilders in the United States.

183.  As an auditing company, E&Y recognized that prospective and existing investors in Lehman were the intended beneficiaries of its work.  In the firm's 2007 Global Review, E&Y's Chairman and Executive Officer, Jim Turley, bragged that E&Y understands the complex world of capital markets and its diligent pursuit of conservative asset valuation policies for the benefit of investors:

> We're bringing the right level of financial skepticism to critical areas such as fair-value determinations, reserving, off-balance sheet structures, and liquidity.  We're requiring consultation with our professional practice leaders on significant or unusual matters.  We're focusing attention on events that occur in these volatile markets subsequent to the date of financial statements.  And we're carefully reviewing client disclosures for timeliness and transparency.

### 1.      E&Y's Role in Lehman's financial statements

184.  During the relevant time period, E&Y reviewed Lehman's quarterly financial statements and issued unqualified audit reports on Lehman's annual financial statements. When the real estate market began to suffer, E&Y turned a blind eye to information in Lehman's financial statements that were improperly reported.  As a result, E&Y violated basic professional and contractual duties, as well as GAAP and generally accepted auditing standards ("GAAS").

185. Throughout 2006, 2007, and 2008, E&Y audited Lehman's financial statements and internal controls, issued written reports as to whether the financial statements were properly reported and performed reviews of Lehman's quarterly financial results.  E&Y reviewed drafts of Lehman's filings with the SEC prior to filing.

186.  Furthermore, E&Y provided audit opinions included in Lehman's Form 10-K for 2006 and 2007, stating that E&Y had conducted its audit in accordance with GAAS and that based on

its review, Lehman's financial statements fairly presented the company's financial position for fiscal years 2006 and 2007 in accordance with GAAP.

187. As Lehman's "independent" auditor, E&Y was aware that its audit reports would be used and relied upon by analysts and prospective and existing Lehman investors in evaluating Lehman's financial condition. E&Y's CEO, Jim Turley, stated in the company's 2007 Global Review:

> Our profession plays a critical role in the world's financial markets. And people everywhere are realizing more and more that the work that we do has a big impact on their lives – on the companies where they work, on the investments that they make, on the pensions on which they depend, as well as on the capital markets and the global economy as a whole. Our work gives people a sense that financial information is being presented fairly according to a common set of rules, whether that is accounting, tax, or transaction rules.
>
> \*      \*      \*
>
> As a profession we are very aware that when we are performing an audit we are working for the owners of the business – the investors – and not the management.

188. However, as internal reports detailed the deterioration of Lehman's real estate portfolio, Lehman's SEC filings and related market reports during this period misrepresented the increased risk exposure from mortgage-related holdings.

### 2.  E&Y's knowledge of Lehman's misrepresentations

189. By virtue of its long history with Lehman, E&Y was intimately familiar with Lehman's business model, its employees, its products, and its increasing exposure through its real estate and mortgage security holdings.[20]

190. E&Y had unique access to the underlying information used to prepare Lehman's financial statements, which was not available to the public, and was well aware that Lehman was improperly cooking its books. As reported later, in June 2008, by the New York Times:

---

[20] David Goldfarb was a top Lehman executive and also a former partner with E&Y.

From the outside, it is impossible to know if Lehman is marking its assets at appropriate levels, or whether it should have taken write-downs earlier than it did. Like other Wall Street firms, it does not disclose its specific assets, or how much it thinks they are worth.  But what is clear is that Lehman's strategy, as the subprime mortgage crisis unfolded and expanded, was to seek to differentiate itself as being so well managed that it would not have the problems other firms might have.

191.  In E&Y's 2007 Global Review, Jim Turley recognized the problems with the subprime market and E&Y's responsibility to alert the public to these issues stating:

There's no doubt that the situation we have in the credit markets is extremely complex.

*       *       *

As for our profession, we've recognized this, and we've been taking an active role trying to help provide businesses and investors with greater clarity and transparency on some of the issues involved.

192.  E&Y knew that Lehman's mortgage portfolio consisted of numerous non-prime loans which were highly susceptible to default.  E&Y recognized the risk of nonpayment inherent in Lehman's securitizations, as well as the risk of a downturn in the economy and the dangers of an overly concentrated investment in mortgage-backed securities, yet failed to inform the investing public of the risks inherent in Lehman's financial statements.

193.  The risks inherent in the securitizations were known to auditors for years.  Though seen as a way to remove loans from the originating bank's balance sheet, securitization programs, in many cases, also had the effect of masking true risk and creating a system in which loan quality became secondary to quantity.

194.  Through its annual audit and quarterly reviews, E&Y knew or recklessly disregarded the (a) true financial condition and exposure of Lehman, (b) the value of Lehman's real estate loan "assets," and (c) Lehman's deteriorating financial condition, which contradicted the unqualified audit reports on Lehman's financial statements.  E&Y's unqualified reports, used by Lehman to

promote its securities to the market, were issued in clear violation of professional standards and fiduciary duties.

195.   E&Y must have known about Lehman's inadequate internal control structure.  Lehman was required to:

> (a)   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> (b)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that -
>
> > (i)   transactions are executed in accordance with management's general or specific authorization;
> >
> > (ii)   transactions are recorded as necessary … to permit preparation of financial statements in conformity with generally accepted accounting principles….
>
> 15 U.S.C. § 78m
> Nonetheless, E&Y certified Lehman's financial statements, while knowing that

Lehman's internal controls were inadequate.

196.   E&Y breached its professional duties to Lehman's investors and, contrary to its statements, failed to design or perform its audit in a manner by which it could then provide unqualified opinions regarding Lehman's financial statements.

### 3.   E&Y's Auditing Requirements

197.   The purpose of an audit is to protect a company's investors, who do not have access to inside information.   This idea was recognized in the United States Supreme Court's pronouncement relating to the "public watchdog" role of an accountant in assuring the accuracy of financial statements.  The Supreme Court stated:

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client.   The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as the investing public.   This "public watchdog" function demands that the accountant maintain total independence

49

> from the client at all times and requires complete fidelity to the public trust.  To
> insulate from disclosure a certified public accountant's interpretations of the
> client's financial statements would be to ignore the significance of the
> accountant's role as a disinterested analyst charges with public obligations.

*U.S. v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984).

198.  Although E&Y's duty was to inform investors of the risk of Lehman's exposure, E&Y ignored its duties and professional responsibilities.

### a.      Generally Accepted Auditing Standards

199.  In order to provide guidelines for auditors, the American Institute of Certified Public Accountants ("AICPA") developed rules and standards, referred to as Generally Accepted Auditing Standards ("GAAS").  These standards consist of general standards of field work and standards of reporting, along with interpretations to assist auditors and provide guidance.

200.  In performing its audit work for Lehman, E&Y had a duty to perform such work in conformity with accounting principles, as well as GAAS' Ten (10) Professional Standards of Care:

### General Standards

1.    The audit must be performed by a person or persons having adequate technical training and proficiency as an auditor.
2.    In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.
3.    Due professional care is to be exercised in the planning and performance of the audit and the preparations of the report.

### Standards of Field Work

4.    The work is to be adequately planned and assistants, if any, are to be properly supervised.
5.    A sufficient understanding of internal controls is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.
6.    Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

**Standards of Reporting**

7.    The report shall state whether the financial statements are presented in accordance with Generally Accepted Accounting Principles.

8.    The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

9.    Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

10.   The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed.  When an overall opinion cannot be expressed, the reasons therefore should be stated.  In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

201.  E&Y violated these standards in its auditing practices.

202.  E&Y violated GAAS Reporting Standard No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP.  E&Y's audit opinion falsely represented that Lehman's financial statements complied with GAAP.  For example, E&Y failed to comply with FAS 157, which requires that financial instruments and other inventory positions must be reported at fair value.

203.  Moreover, E&Y violated GAAS Field Standard No. 1, by failing to adequately plan its audit and properly supervise the work of assistants so as to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities which would have a material effect upon the financial statements.

204.  Additionally, E&Y violated GAAS General Standard No. 3, which requires the auditor to exercise due professional care in the performance of the audit and preparation of the audit report.  Although E&Y was aware of the problems facing the subprime market, E&Y approved Lehman's lack of write-downs.  Furthermore, although the ABX and CMBX created guidance for the valuation of mortgage related assets, E&Y conspired with the fact that Lehman continuously moved its Level 2 assets into Level 3 for reporting purposes.

51

### b.      Statements on Auditing Standards ("SAS")

205. The AICPA issues statements on auditing standards ("SAS") which provide further guidance to external auditors on GAAS in regards to auditing an entity and issuing a report.[21]

206. SAS provides that the purpose of an audit is to obtain an opinion that the financial statements fairly present, in all material respects, the financial position of the company in conformity with GAAP.[22]  Furthermore, the auditor has the affirmative duty to plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud.[23]

207. To obtain such reasonable assurance, the independent auditor has to perform specific GAAS procedures and then determine if anything came to his attention that would lead him to believe that the financial statements were not fairly presented in accordance with GAAP.[24] Indeed, the audit process requires professional skepticism in order to properly test management's representations so that the auditor actually has a reasonable basis on which to form an opinion regarding the financial statements.[25]  The audit opinion is valuable precisely because the auditor is supposed to conduct an independent and skeptical examination of the information provided by management.

208. An auditor must consider (1) planning the audit and designing audit procedures, and (2) in evaluating the results of the audit in relation to the financial statements as a whole.[26]  The auditor must plan the audit to obtain reasonable assurance of detecting material misstatements

---

[21] These standards are referred to with an "AU" number.
[22] AU 110.01.
[23] AU 110.02.
[24] AU 772.09.
[25] AU 333.02.
[26] AU 312.12.

52

that it believes could be large enough, individually or in the aggregate, to be quantitatively material to the financial statements.[27]

209.  The misstatements of Lehman's quarterly and annual financial statements were material and in violation of GAAP.  E&Y breached its professional responsibilities and acted in violation of GAAP and GAAS in its review of the quarterly financials and audits of the annual financial statements of Lehman.

210.  E&Y violated AU 316 which requires the auditor to plan and perform its examination of the financial statements with professional skepticism.  AU 316 begins by stating, "the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."[28]  In Lehman's case, there were numerous red flags and risk factors that alerted E&Y to the potential of misstatements.

211.  E&Y failed to expand its audit procedures and perform effective audit testing to obtain more reliable, persuasive audit evidence because of the above-described significant risk factors and red flags.  As AU 316 states, "[t]he nature of audit procedures may need to be changed to obtain evidence that is more reliable or to obtain additional corroborative information.  For example, more evidential matter may be needed from independent sources outside the entity."

212. E&Y failed, in violation of AU 316, to obtain adequate confirmations and/or otherwise communicate directly with affiliates of Lehman regarding the true value and exposure from Lehman's real estate assets.  E&Y also failed to fully understand the relationships between Lehman, Aurora and BNC, despite knowledge of risk factors and red flags that required action on E&Y's part.

---

[27] AU 312.20.
[28] AU 316.01.

213.  AU 316.27, which discusses the need to exercise professional skepticism in response to the risk of material misstatement, directs: (a) increased sensitivity in the selection of the nature and extent of documentation to be examined in support of material transactions, and (b) increased recognition of the need to corroborate management explanations or representations concerning materials matters.

214.  E&Y is required, as the auditor, to ensure that the Audit Committee of the Board of Directors is aware of, and responds appropriately to, any irregularities that the auditor discovers as part of a review of interim financial information to be filed with a regulatory agency, such as the SEC.[29]  Although E&Y was aware of the problems facing the subprime market, E&Y overlooked Lehman's lack of write-downs.

215.  Additionally, E&Y violated AU 722.18, which states: "If, in performing a review of interim financial information, the accountant becomes aware of information that leads him or her to question whether the interim financial information to be reported conforms with generally accepted accounting principles, the accountant should make additional inquiries or employ other procedures he or she considers appropriate to provide the limited assurance for a review engagement."

216.  E&Y did not follow these basic accounting principles.  As a result, its audit reports misrepresented the true financial condition of Lehman and misrepresented that it had conducted its audits with professional standards of care.  In view of all the previously described risk factors and red flags at Lehman, E&Y should have made additional inquiries, including further communications with customers and other related parties, as described above.

217.  By giving of the unqualified audit opinions for the Lehman financial statements for fiscal years 2006 and 2007, E&Y certified that its audit of Lehman's books and records was done

---

[29] AU 722

in accordance with GAAP and GAAS. It was not. Thus, E&Y's statements were materially misleading.

**E.      Specific Misrepresentations in SEC Filings**

218. Lehman made misrepresentations in its SEC filings including but not limited to the representations discussed below.

### 1.      2006 SEC Filings

219. Christopher O'Meara signed the 10-Q filed by Lehman with the SEC for the first, second and third quarters of 2006. On February 13, 2007, Defendants Fuld, O'Meara, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman and Macomber signed the 10-K filed by Lehman with the SEC for 2006.

220. The 2006 10-Q and 10-K filings contained the following statement regarding risk management:

> Risk management is considered to be of paramount importance in our day-to day operations. Consequently, we devote significant resources (including investments in employees and technology) to the measurement, analysis and management of risk.

> While risk cannot be eliminated, it can be mitigated to the greatest extent possible through a strong internal control environment. Essential in our approach to risk management is a strong internal control environment with multiple overlapping and reinforcing elements. We have developed policies and procedures to identify, measure and monitor the risks involved in our global trading, brokerage and investment banking activities. We apply analytical procedures overlaid with sound practical judgment and work proactively with the business areas before transactions occur to ensure that appropriate risk mitigants are in place.

221. The reports also contained representations regarding market risk stating:

> Market risk represents the potential change in value of a portfolio of financial instruments due to changes in market rates, prices and volatilities. Market risk management also is an essential component of our overall risk management framework. The Market Risk Management Department (the "MRM Department") has global responsibility for developing and implementing our overall market risk management framework. To that end, it is responsible for developing the policies and procedures of the market risk management process; determining the market

risk measurement methodology in conjunction with the Quantitative Risk Management Department (the "QRM Department"); *monitoring, reporting and analyzing the aggregate market risk of trading exposures*; administering market risk limits and the escalation process; *and communicating large or unusual risks as appropriate*. Market risks inherent in positions include, but are not limited to, interest rate, equity and foreign exchange exposures.

222.  Lehman reported in its 2006 10-K:

We value these instruments using prudent estimates of expected cash flows and consider the valuation of similar transactions in the market.  In addition, we utilize derivatives to actively hedge a significant portion of the risk related to these interest to limit our exposure.

223.  The 2006 10-K included E&Y's clean audit opinion on Lehman's consolidated statements of financial conditions:

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lehman Brothers Holdings Inc. at November 30, 2006 and 2005, and the consolidated results of its operations and its cash flows for each of the three years in the period ended November 30, 2006, in conformity with U.S. generally accepted accounting principles.  Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Lehman Brothers Holdings Inc.'s internal control over financial reporting as of November 30, 2006, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 13, 2007 expressed an unqualified opinion thereon.

224.  These statements in Lehman's 2006 SEC filings contained untrue statements of material facts and omitted to state material facts for the reasons set forth in this complaint, *supra*.  The Officer Defendants also failed to disclose Lehman's exposure to the non-prime mortgage market.  Furthermore, the Officer Defendants failed to disclose that its Alt-A mortgages could not be directly hedged.

## 2.    Lehman's 2007 First Quarter 10-Q

225. On April 9, 2007, Defendant Christopher O'Meara signed the 10-Q filed by Lehman with the SEC for the first quarter of 2007.

226. The statements in Lehman's 2007 first quarter 10-Q contained untrue statements of material facts and omitted to state material facts for the reasons set forth in this complaint, *supra*. The Officer Defendants also failed to disclose Lehman's exposure to the non-prime mortgage market.  Furthermore, the Officer Defendants failed to disclose that its Alt-A mortgages could not be directly hedged.

227. Furthermore, in Lehman's first quarter 2007 report, Lehman reported mortgages and mortgage-backed securities collectively rather than disclosing it's holdings of subprime and Alt-A loans.

228. These statements in Lehman's 2007 first quarter 10-Q contained untrue statements of material facts and omitted to state material facts for the reasons set forth in this complaint, *supra*. The Officer Defendants also failed to disclose Lehman's exposure to the non-prime mortgage market.  Furthermore, the Officer Defendants failed to disclose that its Alt-A mortgages could not be directly hedged.

## 3.    Lehman's 2007 Second Quarter 10-Q

229. On July 10, 2007, Defendant Christopher O'Meara signed the 10-Q filed by Lehman with the SEC for the second quarter of 2007.

230. The second quarter 10-Q reported "record net revenues, net income and diluted earnings per share."  Lehman reported net revenue of $5.51 billion, net income of $1.27 billion, and revenue from Principal Transactions of $2.88 billion.

231. The 10-Q filed also reported total assets of $605.86 billion including $285.68 billion in financial instruments and inventory positions owned.  Of the $285.68 billion, Lehman reported that $79.63 billion related to mortgages and mortgage-backed positions and $15.89 billion related to real estate held for sale.

232. The second quarter 2007 filing reported gross revenue of $13.61 billion, net revenue of $3.59 billion, revenue from Principal Transactions of $2.64 billion, Fixed Income revenue of $1.89 billion, income before taxes of $1.35 billion and segment assets of $595.5 billion for the Capital Market segment.

233. Lehman also reported that net revenues decreased compared to the 2006 periods, but stated that they "continue to actively risk manage mortgage-related positions through dynamic risk management strategies."

234. The second quarter 2007 report indicated:

> We utilize a number of risk measurement methods and tools as part of our risk management process.  One risk measure that we utilize is a comprehensive risk measurement framework that aggregates market event risk and counterparty risks. Market event risk measures the potential losses beyond those measured in market risk such as losses associated with a downgrade for high quality bonds, defaults of high yield bonds and loans, dividend risk for equity derivatives, deal break risk for merger arbitrage positions, defaults for mortgage loans and property value losses on real estate investments.  Utilizing this broad risk measure, our average risk for the three months ended May 31, 2007 resulted in a comparative increase from the three months ended February 28, 2007 and November 30, 2006.  The comparative increases in this broad risk measure are largely attributable to growth in the Company's business activities across all business segments and general credit spread movements in the market during the period.

235. The report also addressed reporting assets at fair value stating:

> Financial instruments and other inventory positions owned and other inventory positions sold but not yet purchased, are presented at fair value.

*       *       *

> Fair value is defined as the price at which an asset or liability could be exchanged in a current transaction between knowledgeable, willing parties.  Where available,

58

fair value is based on observable market prices or parameters or derived from such prices or parameters. Where observable prices or inputs are not available, valuation models are applied. These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity. The valuation process to determine fair value also includes making appropriate adjustments to the valuation model outputs to consider risk factors.

Beginning December 1, 2006, assets and liabilities recorded at fair value in the consolidated Statement of Financial Condition are categorized based upon the level of judgment associated with the inputs used to measure their fair value.

236. Lehman reported in the second quarter of 2007 that it carried $79.63 billion in mortgages and mortgage-backed positions on its books. Of this total, the report indicated that $24 million were classified as Level 1 assets, $69.67 billion as Level 2 assets, and $9.93 billion as Level 3 assets. Lehman reported that $96 million of its Level 3 mortgages and mortgage-related assets related to net transfers into Level 3 during the quarter, while $241 million related to realized gains and $459 million related to unrealized losses incurred. Lehman further reported net transfers into Level 3 of $234 million, realized gains of $429 million and unrealized losses of $585 million.

237. Moreover, the second quarter 10-Q reported a $9.1 billion investment grade interest in residential mortgage securitizations, a $1.7 billion non-investment grade interest in residential mortgage securitizations and a $600 million interest in other securitizations at quarter end. Lehman reported that $5.2 billion of its investment grade interests related to "agency collateralized mortgage obligations."

238. The 10-Q contained statements signed by Defendants Fuld and O'Meara:

  1. I have reviewed this quarterly report on Form 10-Q of Lehman Brothers Holdings Inc.;

  2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report are conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in the report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has material affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are

60

reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

239. The report also contained a statement by Defendants Fuld and O'Meara in accordance with Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1350 ("SOX"), that stated:

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), I, [Fuld/O'Meara], certify that:

1. The Quarterly Report on Form 10-Q for the quarter ended May 31, 2007 (the "Report") of Lehman Brothers Holdings Inc. (the "Company") as filed with the Securities and Exchange Commission as of the date hereof, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects the financial condition and results of operations of the Company.

240. The second quarter 10-Q contained the following statement:

Our management, with the participation of the Chairman and Chief Executive Officer and the Chief Financial Officer of Holdings (its principal executive officer and principal financial officer, respectively), evaluated our disclosure controls and procedures as of the end of the fiscal quarter covered by this Report.

Based on that evaluation, the Chairman and Chief Executive Officer and the Chief Financial Officer have concluded that, as of the end of the fiscal quarter covered by this Report, our disclosure controls and procedures are effective to ensure that information required to be disclosed by Holdings in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and include controls and procedures designed to ensure that information required to be disclosed by Holdings in such reports is accumulated and communicated to our management, including the Chairman and Chief Executive Officer and the Chief Financial Officer of Holdings, as appropriate to allow timely decisions regarding required disclosure.

There was no change in our internal control over financial reporting that occurred during the fiscal quarter covered by this Report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

241.  These statements in Lehman's 2007 second quarter 10-Q contained untrue statements of material facts and omitted to state material facts for the reasons set forth in this complaint, *supra*. The Officer Defendants also failed to disclose Lehman's exposure to the non-prime mortgage market and adequately write down its mortgage-related assets in accordance with their fair value. Furthermore, the Officer Defendants failed to disclose that its Alt-A mortgages could not be directly hedged.

### 4.  Lehman's 2007 Third Quarter 10-Q

242.  On October 10, 2007, Defendant Christopher O'Meara signed the 10-Q filed by Lehman with the SEC for the third quarter of 2007. The report for the third quarter of 2007 contained statements on behalf of Lehman regarding internal controls over financial reporting, as well statements regarding SOX compliance.  These statements were substantially similar to those set forth above at ¶¶238-239 and were signed by Defendants Fuld and O'Meara.  The third quarter report also contained statements concerning Lehman's risk management and management's evaluation and the effectiveness of the Company's internal disclosure controls, substantially similar to those set forth above at ¶240.

243.  In the third quarter report for 2007, Lehman reported net revenue of $4.3 billion, net income of $0.8 billion.  The report also included reported revenue from Principal Transactions of $1.61 billion.

244.  With respect to Capital Markets, Lehman reported gross revenue of $12.8 billion, net revenue of $2.4 billion, revenue from Principal Transactions of $1.3 billion, Fixed Income revenues of $1.0 billion, and Capital Markets segment assets of $648.2 billion.

245. Furthermore, the third quarter filing reported that Lehman's Principal Transactions revenues decreased 28%, "with the decrease quarter over quarter generally attributable to

negative valuation adjustments taken in our Capital Markets segment."  Regarding this decrease,

Lehman commented:

> Net revenues for our Fixed Income component of our Capital Markets business segment decreased 47% and 19% for the 2007 three and nine months, respectively.  Our Capital Markets – Fixed Income businesses were the most affected by the market dislocations, risk re-pricing and de-levering that swept through the global capital markets during our third quarter.  The adverse changes in the credit markets and continued correction in certain asset-backed security market segments impacted our valuations for certain inventory assets and lending commitments.  We recorded very substantial valuation reductions, most significantly on leveraged loan commitments and residential mortgage-related positions.  **These losses were partly offset by large valuation gains relating to economic hedges and liabilities.  The impact of these valuation adjustments was a net reduction to revenues in Capital Markets – Fixed Income of approximately $700 million.**

(Emphasis added.)

246.   In the filing, Lehman also asserted that it "measure[s] financial instruments and other inventory positions owned . . .  at fair value."

247.   The third quarter reported included the following statement:

> Generally, assets and liabilities carried at fair value and included in [Level 3] are certain mortgage and asset backed securities, certain corporate debt, certain private equity investments and certain derivatives.

> Financial assets and liabilities presented at fair value and categorized as Level III are generally those that are marked to model using relevant empirical data to extrapolate an estimated fair value.  The models' inputs reflect assumptions that market participants would use in pricing the instrument in a current period transaction and outcomes from the models represent an exit price and expected future cash flows.  Our valuation models are calibrated to the market on a frequent basis.  The parameters and inputs are adjusted for assumptions about risk and current market conditions.  Accordingly, results from valuation models in one period may not be indicative of future period measurements.  Valuations are independently reviewed by employees outside the business unit and where applicable, valuations are back tested comparing instruments sold to where they were marked.

> During the 2007 three months, Level III assets increased to 12% of total Financial instruments and other inventory positions owned and measured at fair value, compared to 8% in the trailing quarter.  The increase in Level III assets resulted

largely from the reclassification of approximately $9.8 billion of assets previously categorized as Level II assets into the Level III category in the third quarter of 2007   Reduced liquidity in the capital markets resulted in a decrease in the observability of market prices for certain financial instruments, particularly for mortgage products.

248. The third quarter report for 2007 reported total assets of $659.21 billion, including $302.29 billion in financial instruments and inventory positions owned.  Of that $302.29 billion, Lehman reported that $88 billion related to mortgages and mortgage-backed positions and $20.04 billion related to real estate held for sale.

249. The third quarter 10-Q further reported that, of the $88 billion in mortgages and mortgage-backed positions recorded as of August 31, 2007, $222 million were classified as Level 1 assets, $65.03 billion as Level 2 assets, and $22.74 billion as Level 3 assets.  Lehman also categorized as Level 2 assets $246 million in mortgages and mortgage-backed positions sold but not yet purchased.

250. Of the Level 3 assets reported, Lehman reported $1.85 billion in periodic payments, purchases and sales, $9.58 billion in net transfers into Level 3, $213 million in realized gains and $829 million in unrealized losses.  For the nine months ended August 31, 2007, Lehman reported $5.39 billion in Level 3 periodic payments, purchase and sales, $9.57 billion net transfers into Level 3, $687 million in realized gains, and $1.11 billion in unrealized losses.

251. In addition, Lehman reported that it carried $9.2 billion in retained investment grade interests in residential mortgage securitizations, $1.7 billion in non-investment grade interests in residential mortgage securitizations, and a $3.4 billion retained interest in other securitizations. Lehman also explained that the $3.4 billion exposure "included approximately $3.2 billion of investment grade commercial mortgages and approximately $0.1 billion of non-investment grade commercial mortgages."

252. The statements in Lehman's 2007 third quarter 10-Q contained untrue statements of material facts and omitted to state material facts for the reasons set forth in this complaint, *supra*. The Officer Defendants also failed to disclose Lehman's exposure to the non-prime mortgage market and adequately write down its mortgage-related assets in accordance with their fair value. Furthermore, the Officer Defendants failed to disclose that its Alt-A mortgages could not be directly hedged.

### 5.    Lehman's 2007 10-K

253. On January 29, 2008, Lehman filed its Annual Report with the SEC for 2007.  The 2007 10-K was signed by Defendants Fuld, Callan, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber.  The 2007 10-K also contained statements of Lehman's financial statements and internal controls over financial reporting, as well as those statements required for SOX compliance.  These statements were substantially similar to those set forth above at ¶¶238-239, and were signed by Defendants Fuld and Callan.  The 2007 10-K also contained statements concerning the Company's risk management and management's evaluation and the effectiveness of the Lehman's internal disclosure controls, which were substantially similar to those set forth above at ¶240.

254. In the 2007 10-K, Lehman reported net revenue of $19.257 billion, including revenues from Principal Transactions of $9.197 billion, net income of $4.192 billion.

255. With respect to Lehman's Capital Markets segment in 2007, the report indicated gross revenues of $51.897 billion, net revenues of $12.257 billion, revenues from Principal Transactions of $8.4 billion, Fixed Income revenues of $5.977 billion.

256. Regarding Lehman's Capital Markets Fixed Income segment, Lehman reported the following values which "generally contributed to the decline of Capital Markets – Fixed Income revenues in 2007 from 2006":

| Gain/(Loss) in Billions | Gross | Net |
|---|---|---|
| Residential Mortgage-Related Positions | $(4.7) | $(1.3) |
| Commercial Mortgage Related Positions | (1.2) | (0.9) |
| Collateralized Debt and Lending Obligation Positions | (0.6) | (0.2) |
| High-Yield Contingent Acquisition Loans and Facilities | (1.0) | --- |
| Valuation of Debt Liabilities | (0.9) | (0.9) |
| **TOTAL** | **$(6.8)** | **$(1.9)** |

257. As in its prior filings with the SEC, Lehman again represented in the 2007 10-K that: "[W]e measure financial instruments and other inventory positions owned . . . at fair value."

258. The 2007 10-K reported total assets of $691.063 billion, financial instruments and inventory positions owned of $313.129 billion, of which the Company stated that $89.106 billion related to mortgages and asset-backed positions.

259. The 2007 10-K also discussed Lehman's Level 3 assets, making representations substantially similar to those set forth above at ¶¶236, 247, 249, and 250. In addition, the 2007 10-K stated:

> During the 2007 fiscal year, our Level III assets increased, ending the year at 13% of Financial instruments and other inventory positions owned, measured at fair value and with our derivatives on a net basis. The increase in Level III assets resulted largely from the reclassification of approximately $11.4 billion of mortgage and asset-backed securities, including approximately $5.3 billion in U.S. subprime residential mortgage-related assets, previously categorized as Level II assets into the Level III category. This reclassification generally occurred in the second half of 2007, reflecting the reduction of liquidity in the capital markets that resulted in a decrease in the observability of market prices. Approximately half of the residential mortgage-related assets that were classified as Level III at the end of the 2007 fiscal year were whole loan mortgages. In particular, the decline in global trading activity impacted our ability to directly correlate assumptions in valuation models used in pricing mortgage-related assets, including those for cumulative loss rates and changes in underlying collateral values to current market activity. Additionally and during the fiscal year, the

66

increase of assets characterized as Level III was also attributable to the acquisition of private equity and other principal investment assets, funded lending commitments that had not been fully syndicated at the end of the fiscal year as well as certain commercial mortgage-backed security positions.

260.   Lehman broke down a portion of its $89 billion position in mortgage and asset-backed securities in the 2007 10-K, as set forth in the chart below:

| In Billions | Nov. 30, 2007 | Nov. 30, 2006 |
|---|---|---|
| **Residential and Asset-Backed:** | | |
| Whole Loans | $19.578 | $18.749 |
| Securities | 16.488 | 7.923 |
| Servicing | 1.183 | .829 |
| Other | 0.086 | 0.016 |
| Total Res. And Asset-Backed | $37.344 | $27.517 |
| **Commercial** | | |
| Whole Loans | $26.200 | $22.426 |
| Securities | 12.180 | 1.948 |
| Other | .588 | .351 |
| Total Commercial | $38.938 | $24.725 |
| **TOTAL** | **$76.282** | **$52.242** |

261.   Lehman also reported a $5.276 billion exposure to subprime residential mortgages, and stated that $3.226 billion of this exposure related to whole loans, while $1.995 billion related to retained interests in securitizations and $55 million to other subprime exposure.

262.   The 2007 10-K also reported $240 million in Level 1, $63.672 billion in Level 2, and $25.194 billion in Level 3 assets of the $89.1 billion mortgage exposure.  Addressing the losses attributable to Lehman's Level 3 assets, the 2007 10-K stated:

Net revenues (both realized and unrealized) for Level III financial instruments are a component of Principal transactions in the Consolidated Statement of Income. Net realized gains associated with Level III financial instruments were approximately $1.3 billion for the fiscal year ended November 30, 2007.  The net unrealized loss on Level III non-derivative financial instruments was approximately$2.5 billion for the fiscal year ended November 30, 2007, primarily consisting of unrealized losses from mortgage and asset-backed positions.  The net unrealized gain on Level III derivative financial instruments was approximately $1.6 billion for the fiscal year ended November 30, 2007, primarily consisting of unrealized gains from equity and interest rate-related derivative

67

positions..   Level III financial instruments may be economically hedged with financial instruments not classified as Level III; therefore, gains or losses associated with Level III financial instruments are offset by gains or losses associated with financial instruments classified in other levels of the fair value hierarchy.

263.  With respect to its Level 3 asset value during fiscal year 2007, Lehman reported $6.914 billion in net payments, purchases and sales, $11.373 billion in net transfers into Level 3, $995 million in realized gains and $2.663 billion in unrealized losses.

264.  Lehman also reported $11.3 billion in retained interests in securitizations.  Of this total, Lehman retained $7.1 billion in investment grade interests in residential mortgage securitizations, $1.6 billion in non-investment grade interests in residential mortgage securitizations, $2.4 billion in investment grade interests in commercial mortgage securitizations, and $26 million in non-investment grade interests in commercial mortgage securitizations.

265.  The 2007 10-K also contained representations concerning Lehman's risk management:

Our goal is to realize returns from our business commensurate with the risks assumed.  Our business activities have inherent risks that we monitor, evaluate and manage through a comprehensive risk management structure.  These risks include market, credit, liquidity, operational and reputational exposures, among others.

The bases of our risk control processes are:

- We establish policies to document our risk principles, our risk capacity and tolerance levels.

- We monitor and enforce adherence to our risk policies.

- We measure quantifiable risks using methodologies and models based on tested assumptions.

- We identify emerging risks through monitoring our portfolios, new business development, unusual or complex transactions and external evens and market influences.

- We report risks to stakeholders.

266.  The 2007 10-K also made representations regarding Lehman's liquidity position:

> Maintaining a liquidity pool that is of sufficient size to cover expected cash outflows for one year in a stressed liquidity environment.

267.  The 2007 10-K included E&Y's clean audit opinion:

> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lehman Brothers Holdings Inc. at November 30, 2007 and 2006, and the consolidated results of its operations and its cash flows for each of the three years in the period ended November 30, 2007, in conformity with U.S. generally accepted accounting principles.  Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

> We also have audited in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Lehman Brothers Holdings Inc.'s internal control over financial reporting as of November 30, 2007, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated January 28, 2008 expressed an unqualified opinion thereon.

268.  The statements in Lehman's 2007 10-K contained untrue statements of material facts and omitted to state material facts for the reasons set forth in this complaint, *supra*. The Officer Defendants also failed to disclose Lehman's exposure to the non-prime mortgage market and adequately write down its mortgage-related assets in accordance with their fair value. Furthermore, the Officer Defendants failed to disclose that its Alt-A mortgages could not be directly hedged.

### 6.    Lehman's 2008 First Quarter 10-Q

269.  On April 8, 2008, Defendant Erin Callan signed the 10-Q filed by Lehman with the SEC for the first quarter of 2008.

270.  The report included statements regarding Lehman's interim financial statements and internal controls over financial reporting, as well as those statements required for SOX

compliance, which were substantially similar to those set forth above at ¶¶238-239, and were signed by Defendants Fuld and Callan. The first quarter 2008 report also contained statements concerning the Company's risk management and the effectiveness of the Lehman's internal disclosure controls, substantially similar to those set forth above at ¶240.

271. In the first quarter 2008 report, Lehman reported net revenues of $3.507 billion, net income of $489 million. In addition, Lehman reported revenues from Principal Transactions of $773 million.

272. Furthermore, in the first quarter 2008 10-Q, Lehman disclosed total assets of $786.03 billion, financial instruments and inventory positions owned of $326.658 billion. Of that $326.65 billion, Lehman disclosed that $84.60 billion related to mortgages and asset-backed positions.

273. With respect to the Capital Markets segment, Lehman reported gross revenues of $10.512 billion, net revenues of $1.67 billion, revenue from Principal Transactions of $420 million, Fixed Income revenues of $262 million and Capital Markets segment assets of $774.6 billion.

274. In the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of the report, Lehman attributed the reduction in Capital Markets Principal Transactions revenues to approximately $1.8 billion in "negative valuation adjustments made on certain components of Capital Markets inventory."

275. Moreover, the first quarter 2008 report indicated a $4.10 billion exposure to the subprime mortgage market: $1.29 billion in residential subprime whole loans, $2.69 billion in retained interests in subprime-backed securitizations, and $30 million in other subprime exposure as of February 29, 2008.

276.  The first quarter 2008 10-Q also reported that Lehman classified $270 million of its $84.6 billion in mortgage and asset-backed securities as Level 1 assets, $60.52 billion as Level 2 assets, and $23.81 billion as Level 3 assets.  Lehman further reported that the quarterly change in its Level 3 assets resulted from $46 million in net payments, purchases and sales, $519 million in net transfers out of Level 3, $83 million in realized gains and $750 million in unrealized losses. The report further reported net gains (unrealized/realized) of $228 million on Level 3 assets.

277.  In addition, Lehman reported the following valuation adjustments to its real estate and mortgage-related positions for the three months ended February 29, 2008:

| Gain/(Loss) in Billions | Gross | Net |
|---|---|---|
| Residential Mortgage-Related Positions | $(3.0) | $(0.8) |
| Commercial Mortgage-Related Positions | (1.1) | (0.7) |
| Collateralized Debt and Lending Obligation Positions | (0.2) | (0.1) |
| Acquisition Finance Facilities (Funded and Unfunded) | (0.7) | (0.5) |
| Real Estate-Related Investments | (0.3) | (0.3) |
| Valuation of Debt Liabilities | 0.6 | 0.6 |
| **TOTAL** | $(4.7) | $(1.8) |

278.  The statements in Lehman's 2008 first quarter 10-Q contained untrue statements of material facts and omitted to state material facts for the reasons set forth in this complaint, *supra*. The Officer Defendants also failed to disclose Lehman's exposure to the non-prime mortgage market and adequately write down its mortgage-related assets in accordance with their fair value. Furthermore, the Officer Defendants failed to disclose that its Alt-A mortgages could not be directly hedged.

**F.    Securities Purchased by Plaintiffs**

279.  Despite rising default rates in the mortgage market and despite Lehman's failure to inform investors of its exposure to the Alt-A and subprime markets, its failure to adequately manage the risk associated with the Alt-A and subprime markets, its refusal to adequately value

its assets and its refusal to take appropriate write-downs (all of which were concealed from the investing public), Lehman offered various securities to investors without making appropriate and required disclosures.

280. All of the Lehman securities purchased by Plaintiffs have lost significant value. Plaintiffs were Lehman investors and made the following purchases of Lehman securities:

| Number | CUSIP | Purchaser | Date Purchased | Face Value |
|--------|-------|-----------|----------------|------------|
| 1 | 52517PVV0 | ANICO | 04/05/2004 | 10,000,000 |
| 2 | 524908BF6 | ANICO | 12/15/2004 | 2,000,000 |
| 3 | 52517PSZ5 | ANPAC | 12/21/2004 | 2,000,000 |
| 4 | 52517PSZ5 | ANGIC[30] | 12/21/2004 | 1,000,000 |
| 5 | 52517PSZ5 | LLOYDS[31] | 12/21/2004 | 1,000,000 |
| 6 | 52517PG96[32] | ANTEX | 04/25/2006 | 1,500,000 |
| 7 | 52517PSZ5[33] | ANICO | 01/01/2007 | 1,000,000 |
| 8 | 52517PS69 | Moody Foundation | 01/29/2007 | 1,000,000 |
| 9 | 52517PS69 | Moody Foundation | 02/07/2007 | 1,000,000 |
| 10 | 52517P6B2 | Moody Foundation | 09/20/2007 | 2,500,000 |
| 11 | 52519FFB2 | Moody Foundation | 01/07/2008 | 1,000,000 |
| 12 | 52519FFD8 | Moody Foundation | 01/22/2008 | 1,000,000 |
| 13 | 52519FFE6 | Moody Foundation | 01/28/2008 | 1,000,000 |
| 14 | 52520W317[34] | CIS | 02/05/2008 | 9,000,000 |
| 15 | 52520W317 | CIS | 03/07/2008 | 1,000,000 |
| 16 | 524908R44 | Moody Foundation | 04/25/2008 | 1,000,000 |

---

[30] ANGIC is American National General Insurance Company.
[31] LLOYDS is American National Lloyds Insurance Company.
[32] The "ANTEX Bond"
[33] The "ANICO Bond"
[34] Both CIS purchases are referred to as "Preferred J" stock.

### 1.      The ANICO Bond

281.  On June 14, 2001, Lehman filed its Prospectus announcing the terms of its medium-term notes, Series G to be issued.  On March 6, 2003, Lehman issued a pricing supplement to the Series G notes.  According to the pricing supplement, Lehman intended to raise $85 million through the sale of its notes priced at 105.900.  ANICO purchased securities pursuant to this Prospectus and its accompanying registration statement.

### 2.      The ANTEX Bond

282.  On May 18, 2005, Lehman filed its Prospectus announcing the terms of its medium-term notes, Series H.  On April 18, 2006, Lehman issued a pricing supplement to the Series H notes.  According to the pricing supplement, Lehman intended to raise $500 million through the sale of its notes priced at 99.863.  ANTEX purchased securities pursuant to this Prospectus and its accompanying registration statement.

### 3.      Preferred J stocks

283.  On February 5, 2008, Lehman filed its prospectus supplement announcing the terms of its Preferred J stock to be issued pursuant to a previously filed registration statement.  According to the prospectus supplement, Lehman intended to sell 66 million shares of Preferred J Securities at $25 per share, for a total value of $1.65 billion.  Due to overallotment allowances granted to underwriters, 75,900,000 shares were issued for a total value of $1.8975 billion.  The underwriters of the offering received approximately $59 million in fees.

### 4.      The Moody Foundation Bonds

#### g.   CUSIP 52519FFE6

284.  On May 30, 2006, Lehman filed its Prospectus for its Series D Notes.  Lehman filed a pricing supplement for these Notes.  According to the pricing supplement, Lehman intended to

raise $43,895,000.  Moody Foundation purchased securities pursuant to this Prospectus and its accompanying registration statement.

### h.   CUSIP 52519FFD8

285.  On May 30, 2006, Lehman filed its Prospectus for its Series D Notes.  Lehman filed a pricing supplement for these Notes.  According to the pricing supplement, Lehman intended to raise $35,909,000.  Moody Foundation purchased securities pursuant to this Prospectus and its accompanying registration statement.

### i.   CUSIP 52519FFB2

286.  On May 30, 2006, Lehman filed its Prospectus for its Series D Notes.  Lehman filed a pricing supplement for these Notes.  According to the pricing supplement, Lehman intended to raise $14,311,000.  Moody Foundation purchased securities pursuant to this Prospectus and its accompanying registration statement.

### j.   CUSIP 52517P6B2

287.  On May 30, 2006, Lehman filed its Prospectus for its medium-term notes, Series I. Lehman filed a pricing supplement for these Notes.  According to the pricing supplement, Lehman intended to raise $5,000,000.  Moody Foundation purchased securities pursuant to this Prospectus and its accompanying registration statement.

### k.   CUSIP 52517PS69

288.  On May 30, 2006, Lehman filed its Prospectus for its medium-term notes, Series I. Lehman filed a pricing supplement for these Notes.  According to the pricing supplement, Lehman intended to raise $10,000,000.  Moody Foundation purchased securities pursuant to this Prospectus and its accompanying registration statement.

l.    **CUSIP 524908R44**

289.  On May 30, 2006, Lehman filed its Prospectus for its medium-term notes, Series I. Lehman filed a pricing supplement for these Notes.  According to the pricing supplement, Lehman intended to raise $1,500,000,000.  Moody Foundation purchased securities pursuant to this Prospectus and its accompanying registration statement. These notes were underwritten by the Moody Foundation Underwriter Defendants.

5.    **Misrepresentations in Registration Statements and Prospectuses for Securities Purchased by Plaintiffs**

290.  When Plaintiffs purchased their respective Lehman securities, Lehman appeared to be a well capitalized investment bank seeking to raise additional capital to pursue business opportunities.  In reality, and as later admitted by Lehman, at the time of each of the offerings Lehman's balance sheet was filled with MBSs and related exposure to the subprime debacle which dramatically increased the risk inherent in lending money to Lehman, none of which was disclosed by the Lehman, its Officers, Directors or any of the Underwriters for Plaintiffs' securities.

291.  The registration statements and prospectuses for each security materially misrepresented the risks associated with investing in Lehman.  Markedly missing from any disclosures was any reference to the effect the down market could have on Lehman's financial position or the price of its securities based upon its business operations.  Nor did Lehman disclose that its commercial and residential mortgage and real estate assets were overvalued by billions of dollars.

292.  At the time of the offering, Lehman was aware of the softening mortgage market and weakening credit market but was not taking proactive steps to lower it exposure or to disclose the risks to the public.  Further, Lehman incorporated by reference the SEC filings that Plaintiffs contend were false and misleading, as described above.

293. Even though Lehman was aware of and experiencing problems at the time of each offering, no one disclosed any of the issues until March 18, 2008, when Lehman released results for the quarter ended February 29, 2008 and a press release stated that Lehman's Capital Markets division had "reported net revenues of $1.7 billion in the first quarter of fiscal 2008, a decrease of 52% from $3.5 billion in the first quarter of fiscal 2007, as strong performances in liquid products such as high grade corporate debt, foreign exchange and interest rate products were offset, in part, by continued deterioration in the broader credit markets, in particular residential mortgages, commercial mortgages and acquisition finance."

## VI.   OFFICER DEFENDANTS' SCIENTER

294. In addition to all scienter allegations pled in this complaint, Plaintiffs further plead that Defendants Fuld, O'Meara, Gregory, Callan and Lowitt (the "Officer Defendants") acted with scienter in intentionally misrepresenting facts to the public and omitting material information from their SEC filings and conference calls.

295. These Officer Defendants were the highest ranking officers at Lehman.  Defendant Fuld was CEO from 1993 until Lehman filed bankruptcy in September 2008. Defendant O'Meara was CFO, Controller and an Executive Vice President from 2004 until December 1, 2007, and was in charge of Lehman's Worldwide Risk Management division. Defendant Gregory acted as COO until he was forced to resign in June 2008. Defendant Callan was CFO and an Executive Vice President from December 1, 2007 until June 2008. Defendant Lowitt became the CFO in June 2008, served as Co-Chief Administrative Officer and was on Lehman's Executive Committee.

296. The Officer Defendants' positions within Lehman made them aware of the circumstances surrounding Lehman's business practices and financial position.  Each of the Officer Defendants made representations or failed to disclose information regarding Lehman's

Alt-A and subprime exposure as well as its financial stability with regard to capital and liquidity through reports and public press conferences.

297. Although Lehman's competitors, many with less exposure to the non-prime mortgage market than Lehman, continuously took large write-downs, Lehman's executives took only minimal write-downs and made statements to the public and Lehman's investors that the company had superior risk management practices.

298. Defendants Fuld, O'Meara, Callan and Lowitt signed 10-Qs and/or 10-Ks verifying SOX compliance attesting to their responsibility for and knowledge of disclosure controls and procedures, as defined in Exchange Act rules 13a-15(e) and 15d-15(E), as well as Lehman's internal control over financial reporting.

299. Emails and documents distributed to Lehman's top executives, including the Officer Defendants, evidence each Officer Defendant's knowledge of Lehman's exposure to the failing market and Lehman's lack of sufficient capital.[35]  However, each of the Officer Defendants continually reassured the public affirmatively stating that Lehman had sufficient capital and was in a position to overcome the rough economic circumstances surrounding the real estate and mortgage markets.

300. Upon information and belief, Lehman was in constant communication with its Alt-A subsidiary, Aurora, and received performance reports on the loans Aurora serviced for Lehman. From these reports, Lehman was made aware that delinquencies and foreclosures began increasing dramatically in 2006.

---

[35] Emails and documents provided to the House of Representatives Committee on Oversight and Government Reform for a hearing on October 6, 2008, regarding the Lehman bankruptcy.

301.  Upon information and belief, BNC, Lehman's subprime subsidiary, distributed monthly reports to Lehman about the problems BNC faced selling its loans in the secondary market, evidencing Lehman's knowledge that the mortgage market was declining.

302. Defendant Fuld even admitted on June 16, 2008, that Lehman did not react to the eroding markets and that Lehman's $2.8 billion loss that it was his responsibility.

303. In September 2008, in the midst of announcing an additional $3.9 billion loss, Defendant Lowitt finally admitted that there was "no direct hedge for Alt-A assets" despite Lehman's previous assurances to the contrary.

304. In a 2008 internal document, Lehman questioned how it had allowed itself to be so exposed while admitting that it saw the warning signs and knew the conditions were not sustainable but did not move early or fast enough to prevent staggering losses.  Such an admission speaks volumes to the Officer Directors' state of mind.

305.  However, despite seeing the warning signs and knowing about the unfavorable market conditions, the Officer Defendants steadfastly refused to provide transparency into Lehman's assets and liabilities resulting in personal rewards for each Officer Defendant.  For example, Defendant Fuld was paid $40 million, Defendant Gregory was paid $34 million and Defendants O'Meara and Lowitt were each paid over $9 million, during the 2007 fiscal year.

A.      **Defendant Fuld**

306.  As early as November of 2004, Defendant Fuld predicted that low interest rates and cheap credit would create a real estate bubble that would one day pop.  Nevertheless, Defendant Fuld repeatedly misled investors by painting an improperly rosy picture of Lehman's financial condition in the company's 10-Ks and 10-Qs.  He knew that the filings contained material misrepresentations regarding Lehman's risk controls, asset valuation, risk exposure to the non-

prime mortgage market and its capital and liquidity all of which impacted Lehman's reported earnings.

307. These material misrepresentations were intentionally made. For example, mere months before Lehman's collapse, when Defendant Fuld was well aware of Lehman's lack of capital, Defendant Fuld agreed with a top Lehman executive that Lehman should spend $2 billion (of a $5 billion capital infusion) to buy back Lehman stock to punish an outspoken short-seller instead of using the money to shore up Lehman's capital position.[36]

308. Further, despite the fact that less than a month earlier Lehman was looking to raise capital, on a June 16, 2008, conference call, Defendant Fuld continued to reassure analysts that Lehman's "capital and liquidity positions have never been stronger" even though Lehman's internal documents predicted that "[with] a small number of investors accounting for a large portion of demand, liquidity can disappear quite fast." Additionally, although Fuld stated that Lehman "had the benefit of much greater price visibility" into the non-prime market, he was well aware that "very few of the top financial issuers have been able to escape damage from the subprime fallout."

> On September 10, 2008, only three months after Defendant Fuld wholeheartedly reassured investors and analysts of Lehman's superior financial condition, Lehman released its third quarter 2008 results and reported a staggering $3.9 billion loss, as well as another $7.8 billion in gross write-downs on its residential and commercial real estate holdings. Despite this news, however, Defendant Fuld told investors that Lehman was on the right track to put the last two quarters ehind it.

309. Five days later, Lehman filed for bankruptcy.

## B.    Defendant O'Meara

310. Defendant O'Meara repeatedly misled investors by painting an improperly rosy picture of Lehman's financial condition in the company's 10-Ks and 10-Qs and in public statements. He

---

[36] May 26, 2008 email from David Goldfarb to Defendant Fuld.

knew that his comments and Lehman's filings contained material misrepresentations regarding Lehman's risk controls, asset valuation, risk exposure to the non-prime mortgage market, and its capital and liquidity all of which impacted Lehman's reported earnings.

311.  The misrepresentations made by Defendant O'Meara were intentional. In a March 2007 conference call, Defendant O'Meara, despite knowing of the problems in the non-prime mortgage market told analysts that the company perceived the subprime business as having a minor impact on the economy and as being "reasonably contained." He even went on to state that Lehman expected to "see various opportunities as a result of the market dislocations."

312.  Defendant O'Meara assured analysts, despite increasing demands on Lehman's capital due to the problems with the mortgage market, that Lehman was "well positioned to benefit from this evolving situation given [its] experience in this sector as well as [its] ample liquidity and risk management practices.

313.  Additionally, although he knew that Lehman's two subsidiaries, Aurora and BNC, were funneling large amounts of *subprime* mortgages to Lehman for securitization, Defendant O'Meara falsely reported that Lehman was "far more active in the prime and Alt-A" mortgages markets and represented that the majority of Lehman's non-investment grade retained interest and securitizations were prime mortgage related.

314. Defendant O'Meara repeatedly assured investors that Lehman actively hedged its inventory positions and that Lehman's hedging strategies were "quite effective." However, Defendant O'Meara never disclosed what hedging strategies Lehman employed and wholly failed to disclose Lehman's inability to directly hedge Alt-A loans.

315. Finally, even while Defendant O'Meara admitted that Lehman had good visibility into the mortgage market, he knew that Lehman increasingly valued its securitizations at Level 3.

C.      **Defendant Gregory**

316. As Chief Operating Officer, Defendant Gregory was in charge of the day-to-day workings of Lehman and was aware of the misrepresentations made by various Lehman officers and directors but did nothing to correct those misrepresentations or filings.

D.      **Defendant Callan**

317. Defendant Callan repeatedly assured investors that Lehman was not exposed to its non-prime securitizations despite the fact that she was aware, by virtue of her position in the company, that Lehman was experiencing capital and liquidity issues.  Defendant Callan represented to investors that Lehman's model with respect to the residential mortgage market was to originate and distribute MBS s rather than hold them.  Based on this model, she stated that Lehman was not betting one way or the other about the performance of the underlying loans.  However, she failed to disclose that even if Lehman did distribute the MBSs in accordance with its model, the company still had exposure to nonperforming loans because of the buy-back provisions contained in the securities.

318. Defendant Callan repeatedly assured investors that Lehman actively hedged its residential mortgage book.  However, Callan also told investors that that residential mortgage book was constituted of primarily prime loans when, in reality, Lehman's book held largely Alt-A and subprime loans.  Defendant Callan failed to tell investors that there was no direct hedge for Alt-A loans.

319. Defendant Callan also commented that Lehman's superior risk management allowed Lehman to avoid large losses in the mortgage market.  However, Defendant Callan, as CFO, was aware that Lehman's hedging strategies were ineffective and that Lehman did not internally manage risk.

81

320. Additionally, despite the fact that Defendant Callan admitted that Lehman had transparency in the Alt-A sector, Lehman continued to move assets from Level 2 to Level 3.

**E.     Defendant Lowitt**

321.  Defendant Lowitt, knowing of Lehman's true exposure to its non-prime securitizations, always falsely reassured investors that Lehman was in a superior position to weather the mortgage market crises.  For example, on November 14, 2007, Defendant Lowitt boasted that Lehman "had success in [its] hedging and so [it didn't] believe that there will be any requirement for substantial markdowns and certainly no requirement for [it] to announce anything."

322. Less than a year later and after repeated assurances that Lehman's mortgage related assets were well hedged, Defendant Lowitt finally admitted on September 10, 2008 that there is no direct hedge for Alt-A mortgages, which made up a majority of Lehman's mortgage related assets.

323. Even in the face of impending disaster, Defendant Lowitt continued to misrepresent Lehman's financial strength.  On September 10, 2008, Defendant Lowitt reported that Lehman's liquidity position remained strong and that Lehman would have ample cash to sustain its business opportunities.  Five days later, Lehman filed for bankruptcy.

## VII.    LOSS CAUSATION

324. The price of Lehman's securities were artificially inflated as a direct result of Defendants' materially false and misleading statement and omissions.  As set forth above, when the true facts became known by the market and investors and the materialization of the risks that had been fraudulently concealed by Defendants occurred, the price of these securities declined precipitously as the artificial inflation was removed from the price of these securities, causing damage to Plaintiffs.

325. Moreover the adverse consequences of the disclosures and nondisclosures were foreseeable to Defendants at all relevant times. Indeed, as set forth in this complaint, the Defendants anticipated the dire consequences of their disclosures.

326. On September 18, 2007, Lehman issued its financial results for the third quarter of 2007. As a result of the misleading information provided, Lehman's stock rose 46.43% A year later, on September 15, 2008, Lehman filed for bankruptcy. This news caused Lehman's shares to fall 95%.

327. Defendants' conduct, as alleged in this complaint, proximately caused foreseeable losses and damages to Plaintiffs.

## VIII. CAUSES OF ACTION

328. Plaintiffs hereby incorporate by reference all the proceeding paragraphs into each of the causes of action and requests for relief listed below and herein.

### A. Violations of Section 10(b) of The Exchange Act

329. All Plaintiffs bring this cause of action against the Officer Defendants for violations of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

330. As explained above, the Officer Defendants are liable for making false and misleading statements, or failing to disclose material adverse facts and acting directly as a participant in a scheme and/or course of business which: (i) deceived the investing public, including Plaintiffs, regarding Lehman, its business, products, and prospects; (ii) artificially inflated the market price of Lehman securities during 2006, 2007, and 2008; and (iii) caused Plaintiffs to purchase Lehman securities at inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Officer Defendants, took the actions set forth previously in this complaint.

331.  Each Officer Defendant's direct participation includes the presentation and/or review of Lehman's false and/or misleading SEC filings, registration statements, prospectuses and/or press releases, and giving false information to securities analysts, money and portfolio managers, and institutional investors in conference calls.

332.  Each Officer Defendant had a duty to disseminate accurate and truthful information promptly with regard to Lehman's operations, financial condition, and performance so that the market prices of Lehman's securities would be based on truthful, complete and accurate information.  Additionally, the Officer Defendants each had a duty to correct any previously issued statements that had become untrue and to disclose any adverse trends known to them that would materially affect Lehman's operating results.  The Officer Defendants' duties are required, in part, by the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X 17 and S-K[37] and other SEC regulations.

333.  Each  Officer Defendant, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as pled with specificity in this complaint in the way that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made not misleading; or (c) engaged in acts, practices and a course of business which operated as a fraud or deceit upon Plaintiffs in connection with their purchases of Lehman securities.

334.  Despite their knowledge of Lehman's false and misleading statements, each Officer Defendant failed, throughout 2006, 2007, and 2008 to disclose material adverse facts about the financial condition and business prospects of Lehman, which caused the SEC filings, registration statements, prospectuses, press releases and other public statements issued in 2006, 2007, and

---

[37] 17 C.F.R. § 210.01 *et. seq.* and 17 C.F.R. 229-10 *et. seq.*, respectively.

2008 to be materially false and misleading for the reasons particularized previously.  Each Officer Defendant, directly and indirectly, knowingly engaged and participated in a fraudulent scheme and course of conduct to conceal adverse material information about the business, finances, financial condition, and future business prospects of Lehman.

335. Each of the Officer Defendant's primary liability (and, indeed, controlling person liability) arises from the fact that: (i) each Officer Defendant was a high-level executive and/or director of Lehman during the years 2006-2008; (ii) each Officer Defendant, by virtue of his or her responsibilities and activities as a senior executive officer and/or director of Lehman, was privy to, and participated in, the creation, development and reporting of Lehman's internal budgets, plans, projections and/or reports; (iii) each Officer Defendant had familiarity with each other and were advised of and had access to other members of Lehman's management teams, internal reports, and other data and information about Lehman's financial condition and performance at all relevant times; and (iv) each Officer Defendant was aware of Lehman's dissemination of information to the investing public that he/she knew was materially false and misleading or for which he/she recklessly disregarded the truth.

336. Plaintiffs, at the time of the misrepresentations and omissions, were ignorant of the falsity of the statements and believed them to be true.  In reliance upon these misrepresentations, and upon the integrity of the market, the securities offering process, the fidelity, integrity and superior knowledge of the Officer Defendants, Plaintiffs, in ignorance of the true condition of Lehman, were induced to and did purchase Lehman securities.  Had Plaintiffs known the truth, they would not have bought their securities or would have bought them at a lower price.

**B.      Violations of Section 20(A) of The Exchange Act**

337.  The Officer Defendants violated Section 20(a) of the Exchange Act and are liable to all Plaintiffs.  Lehman violated Section 10(b) of the Exchange Act by failing to disclose the true nature of its CDOs, the value of its CDOs and the true risk associated with its CDOs.[38]  Each Officer Defendant was, and acted as, a controlling person of Lehman within the meaning of Section 20(a) of the Exchange Act.  Each Officer Defendant had direct involvement in the day-to-day operations of Lehman and with respect to the transactions in question and had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Lehman, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Each Officer Defendant was provided with or had unlimited access to copies of Lehman's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

338. By reason of such wrongful conduct, each Officer Defendant is liable to Plaintiffs pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Lehman securities.

**C.      Violations of Section 11 of The Securities Act**

339.  For purposes of this cause of action, Plaintiffs expressly disavow reliance on and do not incorporate any allegations that may be interpreted to sound in fraud or any allegations relating to scienter.

---

[38] Lehman is expressly not named as a defendant in this Complaint.

### 1.     CIS's Claims

340. CIS brings this claim against Defendant Fuld, the Director Defendants, Preferred J Underwriter Defendants and E&Y.

341. CIS purchased Lehman Preferred Series J stock pursuant to the Shelf Registration Statement dated May 30, 2006, the Prospectus dated May 30, 2006, and the Prospectus Supplement dated February 5, 2008 all filed with the SEC.  The Defendant Fuld and Director Defendants are signatories of the Shelf Registration Statement.  The Preferred J Underwriter Defendants were underwriters, pursuant to Section 11(a)(5) of the Securities Act, of the Preferred J Stock purchased by CIS.  E&Y served as Lehman's auditor at all relevant times and issued statements within the Preferred J registration statement and/prospectus.

342. Defendant Fuld, the Director Defendants, Preferred J Underwriter Defendants and E&Y owed CIS the duty to make a reasonable and diligent investigation of the statements contained in the Shelf Registration Statement, including the Prospectus and Supplemental Prospectus, at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

343. Defendant Fuld, Director Defendants, Preferred J Underwriter Defendants and E&Y issued and disseminated, caused to be issued and disseminated, participated in the issuance and dissemination of, material misstatements to the investing public contained in the Shelf Registration Statement, Prospectus or Supplemental Prospectus which misrepresented or failed to disclose, the facts set forth previously in this complaint.  By reason of the conduct alleged herein, Defendant Fuld, each Director Defendant, Preferred J Underwriter Defendant and E&Y violated Section 11 of the Securities Act.

344.  At the time CIS obtained its shares of Lehman Preferred J, CIS had no knowledge of the facts concerning the misstatements or omissions alleged herein.

345.  By virtue of the foregoing, CIS is entitled to damages under Section 11 of the Securities Act from Defendant Fuld, each of the Director Defendants, Preferred J Underwriter Defendants and E&Y jointly and severally.

### 2.    ANICO's Claims

346.  ANICO brings this claim against Defendant Fuld, the Director Defendants, the ANICO Bond Underwriter Defendants and E&Y.

347.  Defendant Fuld and the Director Defendants were each directors of Lehman at all relevant times.   The ANICO Bond Underwriter Defendants were underwriters, pursuant to Section 11(a)(5) of the Securities Act, of the ANICO Bond.  E&Y served as Lehman's auditor at all relevant times and issued statements within the ANICO Bond registration statement and/prospectus.

348.  Defendant Fuld, the Director Defendants, ANICO Bond Underwriter Defendants and E&Y owed to ANICO the duty to make a reasonable and diligent investigation of the statements contained in the ANICO Bond Registration Statement, including the Prospectus, at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

349.  Defendant Fuld, the Director Defendants, ANICO Bond Underwriter Defendants and E&Y issued and disseminated, caused to be issued and disseminated, participated in the issuance and dissemination of, material misstatements to the investing public contained in the ANICO Bond Registration Statement and Prospectus, which misrepresented or failed to disclose, the

facts set forth above.  By reason of the conduct alleged herein, Defendant Fuld, each Director Defendant, ANICO Bond Underwriter Defendants, and E&Y violated Section 11 of the Securities Act.

350. At the time ANICO obtained the ANICO Bond, it had no knowledge of the facts concerning the misstatements or omissions alleged herein.

351. By virtue of the foregoing, ANICO is entitled to damages under Section 11 from Defendant Fuld, each of the Director Defendants, ANICO Bond Underwriter Defendants and E&Y, jointly and severally.

### 3.    ANTEX's Claims

352. ANTEX brings this claim against Defendant Fuld, Director Defendant, the ANTEX Bond Underwriter Defendants, and E&Y.

353. Defendant Fuld and the Director Defendants were each directors of Lehman at all relevant times.  The ANTEX Bond Underwriter Defendants were underwriters, pursuant to Section 11(a)(5) of the Securities Act, of the ANTEX Bond.  E&Y served as Lehman's auditor at all relevant times and issued statements within the ANTEX Bond registration statement and/prospectus.

354. Defendant Fuld, the Director Defendants, ANTEX Bond Underwriter Defendants and E&Y owed to ANTEX the duty to make a reasonable and diligent investigation of the statements contained in the ANTEX Bond Registration Statement, including the Prospectus, at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

355. Defendant Fuld, the Director Defendants, ANTEX Bond Underwriter Defendants and E&Y issued and disseminated, caused to be issued and disseminated, participated in the issuance and dissemination of, material misstatements to the investing public contained in the ANTEX Bond Registration Statement and Prospectus, which misrepresented or failed to disclose, the facts set forth above. By reason of the conduct alleged herein, Defendant Fuld, each Director Defendant, ANTEX Bond Underwriter Defendants, and E&Y violated Section 11 of the Securities Act.

356. At the time ANTEX obtained the ANTEX Bond, it had no knowledge of the facts concerning the misstatements or omissions alleged herein.

357. By virtue of the foregoing, ANTEX is entitled to damages under Section 11 of the Securities Act from Defendant Fuld, each of the Director Defendants, ANTEX Bond Underwriter Defendants, and E&Y, jointly and severally.

### 4. Moody Foundation's Claims

358. Moody Foundation brings this claim against Defendant Fuld, the Director Defendants, Moody Foundation Underwriter Defendants and E&Y.

359. Defendant Fuld and the Director Defendants were each directors of Lehman at all relevant times. The Moody Foundation Underwriter Defendants were underwriters, pursuant to Section 11(a)(5) of the Securities Act, of securities purchased by the Moody Foundation. E&Y served as Lehman's auditor at all relevant times and issued statements within the relevant registration statements and/prospectuses.

360. Defendant Fuld, the Director Defendants, Moody Foundation Underwriter Defendants and E&Y owed to Moody Foundation the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, including the Prospectus for the securities

purchased by Moody Foundation, at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

361. Defendant Fuld, the Director Defendants, Moody Foundation Underwriter Defendants and E&Y issued and disseminated, caused to be issued and disseminated, participated in the issuance and dissemination of, material misstatements to the investing public contained in the Registration Statement and Prospectus for the securities purchased by Moody Foundation, which misrepresented or failed to disclose, the facts set forth above.  By reason of the conduct alleged herein, Defendant Fuld, each Director Defendant, Moody Foundation Underwriter Defendants, and E&Y violated Section 11 of the Securities Act.

362.  At the time Moody Foundation obtained the Lehman securities, it had no knowledge of the facts concerning the misstatements or omissions alleged herein.

363.  By virtue of the foregoing, Moody Foundation is entitled to damages under Section 11 from Defendant Fuld, each of the Director Defendants, Moody Foundation Underwriter Defendants and E&Y, jointly and severally.

**D.     Violations of Section 12(A)(2) of The Securities Act**

364.  For purposes of this cause of action CIS expressly disavows reliance on and does not incorporate any allegations that may be interpreted to sound in fraud or any allegations relating to scienter.

365.  This Count is asserted by CIS against the Preferred J Underwriter Defendants pursuant to Section 12(a)(2) of the Securities Act.

366.  The Preferred J Underwriter Defendants offered or sold of Lehman Preferred J securities pursuant to the 2006 Prospectus and the 2008 Prospectus Supplement.  The Prospectus contained

untrue statements of material fact and omitted other material facts necessary to make the statements not misleading and failed to disclose material facts. Defendant Wachovia sold CIS the Preferred J stock.

367. The Preferred J Underwriter Defendants were sellers or solicitors within the meaning of the Securities Act because they: (a) transferred title to CIS who purchased the offerings; and (b) solicited Preferred J securities to CIS motivated, at least in part, by a desire to serve their own financial interests and the financial interests of Lehman, including but not limited to the commissions on their sales of those securities.  The Preferred J Underwriter Defendants used means and instrumentalities of interstate commerce and the United States mail.

368. The Preferred J Underwriter Defendants owed CIS the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true and that there were no omissions of material fact necessary to prevent the statements contained in those offering materials from being misleading.  The Preferred J Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained and incorporated by reference into the Prospectuses at the time of the offering in which they participated were true and without omissions of any material facts and were not misleading.  Therefore, the Preferred J Underwriter Defendants are liable to CIS.

369. CIS purchased Lehman Preferred J in the offering pursuant to the materially untrue and misleading Prospectus and did not know or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

370. CIS hereby offers to tender those Lehman Preferred J securities it purchased on the offerings and continue to own in return for the full consideration paid, plus interest, for those securities.

371. Based on the conduct alleged in this Complaint, the Preferred J Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  CIS, therefore, has the right to rescind and tender their securities to Preferred J Underwriter Defendants.

**E.      Violations of Section 15 of The Securities Act**

372. This Count is asserted by all Plaintiffs against Officer Defendants for violations of Section 15 of the Securities Act.  For purposes of this cause of action Plaintiffs expressly disavow reliance on and do not incorporate any allegations that may be interpreted to sound in fraud or any allegations relating to scienter.

373. The Officer Defendants acted as controlling persons of Lehman within the meaning of Section 15 of the Securities Act as alleged herein.  Lehman violated Sections 11 and 12(a)(2) of the Securities Act as discussed in this complaint.[39]  By virtue of their high-level positions, stock ownership, management, and/or participation in the operations of Lehman, the Officer Defendants and Director Defendants had and exercised the power to influence and control the decision-making of Lehman including the content and dissemination of the Prospectuses and SEC filings which contained the untrue statements and omissions of material fact described herein.

374. Each of the Officer Defendants was a culpable participant in the violation of Sections 11 and 12(a)(2) of the Securities Act by virtue of having influenced and controlled the decision making of Lehman, including the content and dissemination of the Registration Statements and Prospectuses which contained untrue statements and omissions of material fact described herein.

---

[39] Lehman is expressly not named as a defendant in this complaint.

375. As a direct and proximate cause of the conduct of the Officer Defendants Plaintiffs suffered damages in connection with their purchase of Lehman Securities.

**F.      Violations of § 27.01 of The Texas Business And Commerce Code**

376. This count is brought by CIS against all Officer Defendants, Director Defendants and Preferred J Underwriter Defendants for violations of Section 27.01 of the Texas Business & Commerce Code.  For purposes of this cause of action CIS expressly disavows reliance on and do not incorporate any allegations that may be interpreted to sound in fraud or any allegations relating to scienter.

377. CIS Purchased 360,000 shares of Preferred J stock underwritten by the Preferred J Underwriters on February 5, 2008 and 40,000 shares on February 25, 2008.  CIS purchased the Preferred J shares through Wachovia.   The Officer Defendants, Director Defendants and Preferred J Underwriter Defendants made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

378. The misrepresentations were intended to and did (i) deceived CIS about the risks associated with Lehman's liquidity and real estate holdings ; (ii) artificially inflated and maintain the price of the Preferred J; (iii) caused CIS to purchase the Preferred J at artificially inflated prices; and (iv) deprived CIS of the expected return on its investment.

379. The Prospectus that described the Preferred J was materially false and misleading because it failed to reveal Lehman's significant exposure to the subprime market as the largest underwriter of U.S. mortgage bonds.  The Prospectus also failed to disclose that as a result of the deteriorating market conditions and rapidly declining asset values, Lehman was in desperate need for capital and at a substantial risk of failing as a going-concern.

380.  Specifically missing from the disclosures in the "Risk Factors" section of the Prospectus was any reference to the effect of the down market could have on its financial position or the price of its securities based upon the Lehman's business operations.  Nor did Lehman disclose that its commercial and residential mortgage and real estate assets were overvalued by billions of dollars.

381. The Officer Defendants, Director Defendants, and Preferred J Underwriter Defendants made the foregoing misrepresentations and/or omissions with the intent to induce purchasers of the Preferred J.

382.  CIS reasonably and justifiably relied on the misrepresentations in deciding to purchase Preferred J.

383.  As a direct and proximate result of the Officer Defendants, Director Defendants and Preferred J Underwriter Defendants wrongful conduct, CIS incurred substantial monetary damages.

**G.     Aiding And Abetting Violations of § 27.01 of The Texas Business and Commerce Code**

384.  This Count is brought by CIS against the Officer Defendants, Director Defendants and Preferred J Underwriter Defendants.  The Officer Defendants, Director Defendants and Preferred J Underwriter Defendants directly and indirectly materially aided Lehman in the fraudulent sale of the Preferred J.  In doing so, the Officer Defendants, Director Defendants, and Preferred J Underwriter Defendants had an actual awareness that Lehman made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

385.   The Officer Defendants, Director Defendants and Preferred J Underwriter Defendants knew that its conduct was false, deceptive and/or unfair and failed to disclose the falsity of the representations to CIS.

386.   The Officer Defendants, Director Defendants and Preferred J Underwriter Defendants had knowledge regarding the financial affairs of Lehman but failed to correct its statements to investors prior to the purchase of the Preferred J by investors.

387.   CIS reasonably and justifiably relied on the misrepresentations in deciding to purchase the Preferred J from Wachovia.

388.   CIS would not have purchased the Preferred J securities if the true state of Lehman's financial state was not omitted from the Prospectus.

389.   CIS benefited from the Officer Defendants, Director Defendants, and Preferred J Underwriters' material misrepresentations.

390.   As a direct and proximate result of Officer Defendants, Director Defendant, and Preferred J Underwriter Defendants aiding and abetting Lehman's fraud, CIS has suffered damages.

**H.      Violations of The Texas Securities Act**

391.   This Count is asserted by CIS against Defendant Wachovia for violations of Article 581, Section 33A.  Defendant Wachovia offered and sold Preferred J stock to investors including CIS. In doing so, Defendant Wachovia made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading and false.  According to the Prospectus, underwritten and sold by Defendant Wachovia, Lehman appeared to be a well capitalized investment bank seeking to raise additional capital to pursue business opportunities.  In reality and as later admitted by

Lehman at the time of the offering, Lehman's balance sheet was filled with combustible MBSs and related exposure to the subprime debacle which dramatically increased the risk inherent in lending money to Lehman, but which were undisclosed by Lehman.

392. The Prospectus materially misrepresented the risks associated with investing in the Lehman.  Markedly missing from the disclosures in the "Risk Factors" section of the Prospectus was any reference to the effect the down market could have on its financial position or the price of its securities based upon the Lehman's business operations.  Nor did Defendant Wachovia disclose that its commercial and residential mortgage and real estate assets were overvalued by billions of dollars.  Had Defendant Wachovia conducted a proper and adequate due diligence investigation, however, they would have realized the effect caused by the softening mortgage market and weakening credit market.

393. The foregoing representations were false at the time they were made.

394. Defendant Wachovia's misrepresentations (i) artificially inflated and maintained the price of the securities; (ii) caused CIS to purchase the securities at artificially inflated prices; and (iii) deprived CIS of the expected return on its investment.

395. As a direct and proximate result of Defendant Wachovia's conduct, CIS incurred substantial monetary damages.

I.      **Aiding & Abetting Violations of The Texas Securities Act**

        1.      **CIS's Claims**

396. This Count is asserted by CIS against the Officer Defendants, Director Defendants, Preferred J Underwriter Defendants, and E&Y.  The Officer Defendants, Director Defendants, Preferred J Underwriter Defendants, and E&Y violated the Texas Securities Act by selling Preferred J by virtue of false and misleading statements of material fact.

397. With general awareness of its role in the misrepresentations of the Preferred J Prospectus, the Officer Defendants, Director Defendants, Preferred J Underwriter Defendants, and E&Y directly and indirectly, with intent to deceive or defraud or with reckless disregard for the truth for the law, materially aided Defendant Wachovia in making untrue statements of material fact and omitting material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

398. The Officer Defendants, Director Defendants, Preferred J Underwriter Defendants, and E&Y knew or acted with reckless disregard for the truth in not knowing, that Defendant Wachovia's representations regarding the risks of the risk of the securities were false.

399. The Officer Defendants and Director Defendants approved and filed the Preferred J Prospectus purchased and the Preferred J Underwriter Defendants underwrote the Preferred J. E&Y acted as Lehman's auditor and included statements in the Preferred J issuing documents. Thus the Officer Defendants, Director Defendants, Preferred J Underwriter Defendants and E&Y had knowledge regarding the status of Lehman's financial condition but failed to correct Defendant Wachovia's statement to investors prior to the purchase of the Preferred J by investors from Defendant Wachovia.

400. Defendant Wachovia, with material assistance from the Officer Defendants, Director Defendants, Preferred J Underwriter Defendants, and E&Y made or omitted to make statements with reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale Preferred J. To the reader of the Prospectus, in the beginning of 2008 Lehman appeared to be a well capitalized investment bank seeking to raise additional capital to pursue business opportunities. In reality and as later admitted by Lehman, at the time of the offering Lehman's balance sheet was filled with combustible MBSs and related exposure to the

subprime debacle which dramatically increased the risk inherent in lending money to Lehman, but which were undisclosed by Lehman.

401. The Prospectus materially misrepresented the risks associated with investing in the Lehman. Markedly missing from the disclosures in the "Risk Factors" section of the Prospectus was any reference to the effect the down market could have on its financial position or the price of its securities based upon Lehman's business operations. Nor did Lehman disclose that its commercial and residential mortgage and real estate assets were overvalued by billions of dollars. Had Defendant Wachovia conducted a proper and adequate due diligence investigation, however, it would have realized the effect caused by the softening mortgage market and weakening credit market.

402. The Officer Defendants, Director Defendants, Preferred J Underwriter Defendants, and E&Y's representations were false at the time they were made and the Officer Defendants, Director Defendants, Preferred J Underwriter Defendants, and E&Y knew the representations were false or acted with reckless disregard for the truth in not knowing that its statements were false.

403. CIS would not have purchased the Preferred J securities if the true financial health of Lehman had been accurately stated in the Prospectus.

404. As a direct and proximate result of the Officer Defendants, Director Defendants, Preferred J Underwriter Defendants, and E&Y aiding and abetting Wachovia's misrepresentations, CIS has suffered damages.

2.      **Moody Foundation's Claims**

405. This Count is asserted by Moody Foundation against the Officer Defendants, the Director Defendants, Moody Foundation Underwriter Defendants, and E&Y for violations of Article 581, Section 33F.

406. Lehman violated the Texas Securities Act by selling and/or issuing Moody Foundation securities by virtue of false and misleading statements of material fact.

407. With general awareness of its role in the misrepresentations of the Moody Foundation securities at issue in this matter, the Officer Defendants, Director Defendants, Moody Foundation Underwriter Defendants, and E&Y directly and indirectly, with intent to deceive or defraud or with reckless disregard for the truth for the law, materially aided and substantially assisted Lehman in making untrue statements of material fact and omitting material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and false.

408. The Officer Defendants, Director Defendants, Moody Foundation Underwriter Defendants, and E&Y knew or acted with reckless disregard for the truth in not knowing, that Lehman's representations regarding the risks of the securities were false.

409. The Officer Defendants, Director Defendants, Moody Foundation Underwriter Defendants, and E&Y approved and filed the securities purchased, and the Moody Foundation Underwriters underwrote the securities.  Thus the Officer Defendants, Director Defendants, Moody Foundation Underwriter Defendants, and E&Y had knowledge regarding the status of Lehman's financial condition but failed to correct financial statements prior to Moody Foundation's purchase of Lehman securities.

410. Lehman, with material assistance from the Officer Defendants, Director Defendants, Moody Foundation Underwriter Defendants and E&Y, made or omitted to make statements with reckless disregard for the truth and employed devices and artifices to defraud in connection with the purchase and sale of Lehman securities.  As  admitted by Lehman after the purchase of Lehman securities Lehman's balance sheet was filled with combustible MBSs and related exposure to the subprime debacle which dramatically increased the risk inherent in lending money to Lehman, but which were undisclosed by Lehman.

411. The Lehman securities materially misrepresented the risks associated with investing in the Lehman.  Markedly missing from the disclosures in the "Risk Factors" section of the securities are any reference to the effect the down market could have on its financial position or the price of its securities based upon Lehman's business operations.  Nor did Lehman disclose that its commercial and residential mortgage and real estate assets were overvalued by billions of dollars.  Had the Officer Defendants, Director Defendants, Moody Foundation Underwriter Defendants, and E&Y conducted a proper and adequate due diligence investigation, however, it would have realized the effect caused by the softening mortgage market and weakening credit market.

412. The Officer Defendants, Director Defendants, Moody Foundation Underwriter Defendants, and E&Y representations were false at the time they were made and the Officer Defendants, Director Defendants, Moody Foundation Underwriter Defendants, and E&Y knew the representations were false or acted with reckless disregard for the truth in not knowing that its statements were false.

413. Moody Foundation would not have purchased the Lehman securities if the true financial health of Lehman had been accurately stated.

414.  As a direct and proximate result of the Officer Defendants, Director Defendants, Moody Foundation Underwriter Defendants, and E&Y aiding and abetting Lehman' misrepresentations, Moody Foundation has suffered damages.

**J.      Violations of the Texas Securities Act – Control Person Liability**

415.  This Count is asserted by the Moody Foundation against Officer Defendants for violations of Article 581, Section 33F.

416.  The Officer Defendants exercised active control over the day-today affairs of Lehman and had the power to influence or control the transactions described above that gave rise to violations of the Texas Securities Act alleged above.  As such, the Officer Defendants are controlling persons of Lehman and are jointly and severally liable to the Moody Foundation.

417.  As a direct and proximate result of the Officer Defendants acts, Moody Foundation has suffered damages.

**K.      Common Law Fraud**

418.  All Plaintiffs bring this cause of action against each Officer Defendant.

419.  As fully described above, each Officer Defendant made false and misleading statements and/or material omissions of fact to Plaintiffs in connection with their purchase of Lehman securities.

420.  Each Officer Defendant knew the representations were false at the time they were made.

421.  Such statements of fact were material to Plaintiffs in their decision to purchase the Lehman Securities.

422.  Plaintiffs reasonably relied upon the Officer Defendants materially false and misleading misrepresentations and/or material omissions of fact.

423. Each Officer Defendant intended that Plaintiffs would act on their misrepresentations and purchase Lehman securities.

424. Plaintiffs were damaged as a result of each Officer Defendant's materially false and misleading statements and/or material omissions of fact.

**L.   Negligent Misrepresentation**

425. CIS and Moody Foundation bring this cause of action against the Officer Defendants. For purposes of this cause of action, CIS and Moody Foundation expressly disavows on and does not incorporate any allegations that may be interpreted to imply reckless or intentional conduct or that may be interpreted to sound in fraud or any allegations relating to scienter.

426. As detailed above, Officer Defendants made false and misleading statements and/or material omissions of fact to CIS and Moody Foundation in connection with its purchase of Lehman Securities.

427. The Officer Defendants owed CIS and Moody Foundation the duty to ensure any such statements they made were true and correct and that there was no omission of material facts required to be stated to make the statements contained therein fair and accurate.

428. The Officer Defendants made such misrepresentations in SEC filings and in the prospectuses and registration statements, and public pronouncements pursuant to which CIS and Moody Foundation purchased its Lehman securities.

429. The Officer Defendants had pecuniary interests in Lehman securities.

430. Such statements of fact were made to CIS and Moody Foundation with the intent that it would rely on them.

431. CIS and Moody Foundation reasonably and justifiably relied upon the Officer Defendants materially false and misleading misrepresentations and/or material omissions of fact.

432.  The Officer Defendants knew, or in the exercise of reasonable care should have known, that their representations were false.

433. CIS and Moody Foundation were damaged as a result of the Officer Defendants materially false and misleading statements and/or material omissions of fact.

434. CIS and Moody Foundation were in the limited class of persons the Officer Defendants knew would rely on their representations.

## IX.  PRAYER

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Defendants as follows:

        a.      Actual damages, including all direct, consequential, and special damages;

        b.      All equitable relief to which they may be entitled;

        c.      Pre-judgment interest as provided by law;

        d.      Punitive damages as provided by statutory and common law;

        e.      Attorneys' fees and legal expenses (including expert fees);

        f.      Post-judgment interest; and

        g.      Costs of Court.

Plaintiffs further pray for general relief and such other and further monetary or equitable relief to which they may be entitled.  Plaintiffs respectfully demand a trial by jury.

Respectfully submitted,

**GREER, HERZ & ADAMS, L.L.P.**

By: /s/ Andrew J. Mytelka                    .
    **Andrew J. Mytelka**
    **Attorney-in-Charge**
    S.D. Texas Federal  I.D. No. 11084
    State Bar No. 14767700
    **Janet L. Rushing**
    State Bar No. 17403100
    S.D. Texas Federal I.D. No. 11570
    **Roni S. Mihaly**
    State Bar No. 24027899
    S.D. Texas Federal I.D. No. 29994
    **Eric J. Kirkpatrick**
    State Bar No. 24031215
    S.D. Texas Federal I.D. No. 500364
    One Moody Plaza, 18th Floor
    Galveston, Texas  77550
    (409) 797-3200 (Telephone)
    (409) 766-6424 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS**

105